STATE OF CONNECTICUT *v.* NATHANIEL J. CARTER
(9970)

SPEZIALE, C. J., HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued December 1, 1982—decision released April 5, 1983

*Eugene J. Riccio,* assistant public defender, with whom, on the brief, was *Patricia McAllister,* deputy assistant public defender, for the appellant (defendant).

*Jonathan C. Benedict,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (state).

SHEA, J. The jury found the defendant guilty of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1) and of sexual assault in the first degree in violation of General Statutes § 53a-70 (a). He was sentenced to consecutive terms of imprisonment for each offense.

In his appeal from the judgment of conviction he has raised four issues: (1) whether his confession was properly admitted into evidence; (2) whether a fingerprint found at the crime scene and identified as that of the defendant should have been excluded; (3) whether his request to charge upon intoxication in relation to the mental element required for the crime of burglary should have been granted; and (4) whether the instructions given to the jury on the elements required by the statutes for a conviction of each offense as charged were correct. We find error only in the failure to charge upon intoxication in relation to the specific intent required for burglary in the first degree.

From the evidence the jury could reasonably have found that in the early morning hours of May 16, 1979, the defendant entered the home of the victim in Greenwich through a rear window which was unlocked. He went upstairs to a bedroom where he found the victim sleeping. When she awoke the defendant threatened her with a knife and forced her to engage in sexual intercourse with him. He then left the premises. The victim could not identify her assailant, but gave a general description of him and said that he smelled of beer. The description was of a black male wearing dungaree type pants. A fingerprint found on the downstairs bathroom window sill of the house was found to be that of the defendant.

I

The circumstances surrounding his arrest about two weeks after the May 16, 1979 incident had occurred, which were thoroughly explored at the pretrial hearing on his motion to suppress, are relied upon by the defendant to support his claim

that his confession, as well as his fingerprints taken after the arrest, were the fruit of an unlawful seizure of his person. See *Dunaway* v. *New York,* 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *Brown* v. *Illinois,* 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975).

Just before 2:30 a.m. on May 31, 1979, Officers Lawrence Conners and William Carroll of the Greenwich police department overheard a radio dispatch directing other policemen to investigate a burglary on Cary Road. Five to ten minutes later they heard a description of the suspect as a black male dressed in a dungaree type outfit. About 3 a.m. they received a dispatch ordering them to proceed to the eastern side of Greenwich and to investigate a second burglary on River Road. When the officers reached River Road about 3:10 a.m. they observed the defendant riding an unlighted bicycle near the center of the road in a southerly direction at a point about 100 yards south of the location of the second burglary. They beckoned the defendant to stop and he did so.

At the hearing on the motion to suppress, Conners testified that the defendant was riding his bicycle in a hazardous manner and also that he fit the description which had been broadcast earlier of the suspected Cary Road burglar. The scene of that burglary was approximately one-quarter mile away. The defendant was wearing a red sleeveless body shirt and dark pants. He also had a dark blue nylon windbreaker fastened to his bicycle. His clothing was dirty, with pine needles on it, as if he had been rolling on the ground.[1] When he was

---

[1] Officer Joseph Gavin, who came from the scene of the Cary Road burglary to River Road in order to examine the tread of the defendant's sneakers, testified that there was a "mixture of pine and needle

asked what he was doing, the defendant responded that he had been assaulted by two white "dudes" in a station wagon and had been looking for a police officer. He said he had been traveling from Port Chester to his home in Stamford. This account aroused some suspicion on the part of the officers because the defendant had been proceeding in the wrong direction if he intended to return to Stamford. The defendant gave his name, but had no identification with him.

A call to headquarters was made to check for warrants outstanding against the defendant and also to advise the officers investigating the Cary Road burglary that a suspect had been found. A radio message from those officers was received inquiring whether the defendant was wearing sneakers or jogging shoes. The defendant was wearing athletic type sneakers similar to jogging shoes and this information was transmitted to the officers on Cary Road.

About five minutes after the defendant had been stopped he was placed in the police car. Before entering the vehicle the defendant was frisked for weapons. After the defendant was in the police car, the officers noticed that he resembled a composite picture made by the Greenwich police department of a suspect wanted for burglaries in the general area.

---

leaf shrubbery" around the Cary Road residence and also some pine trees. There is no testimony, however, indicating whether Gavin made this observation before he took the defendant into his custody or whether he noticed any pine needles on the defendant's clothing. There is also no testimony as to when Conners, who had noticed the pine needles on the defendant's clothing, became aware of the significance of this fact as indicating that the defendant had visited the Cary Road residence. See 1 LaFave, Search and Seizure § 3.5 (c), (d).

Within a period of less than ten minutes after the defendant was stopped, Officer Joseph Gavin, who had been investigating the Cary Road burglary, arrived on River Road where the defendant was being held. A distinctive sneaker print, which was believed to have been left by the burglar, had been discovered at the scene of the Cary Road burglary. After the defendant had lifted his foot as requested, Gavin observed that the sneaker tread was similar to the print at the crime scene.

The defendant and his bicycle were transported to Cary Road by Gavin, who then requested the defendant to remove his sneaker. After the police obtained the sneaker, its tread was compared to the print left on a sink in the kitchen of the burglarized residence and they were found to be identical.

The defendant was then taken to the Greenwich police station for further questioning. There, a summons for the infraction of operating an unlighted bicycle at night in violation of General Statutes § 14-288 (a) was given to him. The normal police policy was to bring all violators who had no driver's license or other proof of identity to the police station before issuing a summons.

Although the defendant contends otherwise in his brief,[2] we have concluded that Conners and Carroll were justified in stopping the defendant because of both the traffic law violation they observed and their knowledge of the circumstances of the nearby Cary Road burglary, which had been reported about forty minutes earlier. Proximity

---

[2] During oral argument the defendant agreed that the initial stop was proper under the principles of *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

in time and place of the stop to the crime is highly significant. *Luckett* v. *State,* 259 Ind. 174, 180–81, 284 N.E.2d 738 (1972); *Commonwealth* v. *Nastari,* 232 Pa. Super. 405, 411, 335 A.2d 468 (1975); *State* v. *Smith,* 9 Wash. App. 279, 280–81, 511 P.2d 1032 (1973); 3 LaFave, Search and Seizure § 9.3(d). The description of a black male wearing dungaree type clothes might have been too general in other contexts. At 3 a.m. in a location close to the scene of two recent burglaries, one on Cary Road a quarter mile distant and the other, which Conners and Carroll had been ordered to investigate, about a hundred yards north on River Road, the description was sufficiently distinctive to give rise to a "reasonable and articulable" suspicion that the defendant had engaged in criminal activity. *Reid* v. *Georgia,* 448 U.S. 438, 440, 100 S. Ct. 2752, 65 L. Ed. 2d 890 (1980); *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

The defendant claims that even if his initial stop was not improper, the police exceeded the permissible scope and duration of such an investigative detention prior to the time when the facts known to them would support the inference of probable cause necessary for an arrest. We disagree. It is true that the traffic law infraction would not have been a sufficient basis for an arrest, since the issuance of a summons is the prescribed procedure. General Statutes § 51-164n (a); Practice Book §§ 1004, 1007. The failure of the defendant to produce some proof of his identity may have justified his detention until some further assurance of his name and residence could be obtained. The officers, however, were not interested in holding him at the scene for that purpose. For reasons we have found sufficient, they sus-

pected that he had committed the burglaries which were under investigation and they wanted to keep him until their suspicions were confirmed or removed.

"A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams* v. *Williams,* 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972). "The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." *State* v. *Watson,* 165 Conn. 577, 585, 345 A.2d 532 (1973).

The procedure followed after the defendant was first accosted by Conners and Carroll was consistent with these principles. The initial investigation concerned only the identity of the defendant, a necessary inquiry for the issuance of a traffic violation summons, and his present activity. His response that he was going to Stamford, which the officers believed was untruthful because of the direction in which he was proceeding, was ground for additional suspicion. The inquiry from the Cary Road burglary unit as to whether the defendant wore sneakers or jogging shoes, which was received five minutes after he was first stopped and before he was placed inside the police car, provided a reason to hold the defendant for an additional five minutes until Gavin arrived. It was during

this period that Conners noted the resemblance of the defendant to the composite picture of a suspected burglar.

Once Gavin observed the similarity of the tread design on the sneakers worn by the defendant to the print he had seen in the house at Cary Road, the facts known to these officers working in concert amounted to probable cause for arresting the defendant. See *United States* v. *Ragsdale,* 470 F.2d 24, 28–29 (5th Cir. 1972). We need not decide, therefore, whether the scope of permissible investigative detention would have justified transporting the defendant a short distance to that location so that a more precise comparison could be made. The fact that the police did not intend to arrest the defendant until the tread on his sneakers was found to match the print left on the sink of the burglarized residence does not detract from the basis supporting a lawful arrest of the defendant before he and his bicycle were placed in Gavin's cruiser. If this transportation of the defendant amounted to a seizure of his person, it was not unlawful because probable cause existed at that time for an arrest. *Sibron* v. *New York,* 392 U.S. 41, 67, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968). The duration of the period of detention prior to the departure from River Road does not appear to have been excessive.[3] We conclude that the police did not

[3] American Law Institute, Model Code of Pre-Arraignment Procedure (1975) § 110.2(1) provides: "CASES IN WHICH STOP IS AUTHORIZED. A law enforcement officer, lawfully present in any place, may, in the following circumstances, order a person to remain in the officer's presence near such place for such period as is reasonably necessary for the accomplishment of the purposes authorized in the Subsection, but in no case for more than twenty minutes . . . ."

overstep the bounds of proper investigative detention before sufficient grounds for probable cause had been established.

## II

The defendant also contends that his confession should have been excluded from evidence because it was not "a product of an essentially free and unrestrained choice by its maker" and was, therefore, involuntary. The facts pertinent to this issue were also presented at the hearing on the motion to suppress.

After the defendant was taken to the Greenwich police headquarters, two detectives, Roland H. Hennessey and Theodore J. Brosko, were called for the purpose of questioning him. They arrived between 4:30 and 4:45 a.m. The defendant was taken to an interview room by Hennessey and, when Brosko also was present, the conversation began. Hennessey read the standard *Miranda* warning to the defendant from a card. When asked whether he understood what had been read to him the defendant replied that he did. He had been involved previously with the criminal justice system. The officers then questioned him about the Cary Road burglary. As a result of this investigation the defendant admitted he had entered the Cary Road residence through an open window. At 5:30 a.m. Brosko began to type a statement of the details of this burglary. When it was completed the defendant signed this confession, which also contained on the first page an acknowledgement that he had been advised of each element of the *Miranda* warning. He initialed the separate paragraphs of this page as they were read to him, one of which expressly stated that he did not wish

to have an attorney present while he was giving the statement. He never claimed that he could not read.

Once the Cary Road confession was signed the defendant was asked if he wanted something to eat or some coffee. It is unclear whether he did eat at that time, but Brosko recalled that he had something to eat at some point during the interrogation. The detectives began a conversation about the sexual assault offense which is the subject of this appeal and which had occurred on May 16, 1979, about two weeks before. Hennessey had investigated that crime and he thought that the defendant fit the general description which had been given of the offender. Ultimately, the defendant admitted his involvement in that occurrence and at 8:45 a.m. Brosko began to prepare another typewritten statement, which also contained a standard form acknowledging receipt of the *Miranda* warning. The defendant read the statement aloud after it was completed, initialed the space beside each paragraph of the *Miranda* warning, signed the last page, and swore to its truth. The defendant also made a handwritten notation on the last page as follows: "I, Nathaniel Carter, volunteered and turned myself in to two officers riding in a police car. I need help from someone." In this statement the defendant admitted that he had entered the home of the victim and that he had had intercourse with her. He denied the use of any force or violence and said that the victim virtually consented to have sexual relations. He indicated that at the time he was under the influence of "speed, booze and reefer" which he had consumed earlier when he had been in Stamford and Port Chester.

After he had signed the second statement, the defendant was then questioned about another sexual assault which had occurred on April 23, 1979, and a signed confession to that crime was obtained about 11:30 a.m.

The only confession which came into evidence at the trial was that pertaining to the offense of May 16, 1979, which is the subject of this appeal. The defendant claims no deficiency in the technique followed by the police in obtaining this confession which would support a challenge based upon non-compliance with the requirements of *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). He contends that a review of the entire circumstances does not justify a finding that he knowingly and voluntarily waived his constitutional right against self-incrimination. He relies upon his own testimony that at the time of the confession he was suffering from a physical injury, that he was extremely fatigued because of lack of sleep, that his mental condition was impaired by his use of drugs and alcohol, that the lengthy interrogation was coercive, and that he was induced to confess by a promise of psychiatric help.

"The question [is] whether the will of the defendant had been overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances." *Procunier* v. *Atchley,* 400 U.S. 446, 453, 91 S. Ct. 485, 27 L. Ed. 2d 524, reh. denied, 401 U.S. 966, 91 S. Ct. 966, 28 L. Ed. 2d 249 (1971). The trial court was not obliged to believe the defendant, who testified in support of his claims at the pretrial hearing, rather than the several police officers who gave evidence to the contrary. It was undisputed that, after his

confessions and the procedures relating to his arrest were completed, the defendant was taken to the hospital for treatment of a leg injury which he claimed to have received in a stabbing incident about two weeks earlier. Although the wound was not bleeding, the old bandage was replaced with a new one and the defendant was discharged. Hennessey testified that the defendant never complained about an injury to his leg until after the three confessions had been obtained.[4] Several officers said that the defendant appeared to be alert and that there was no observable indication that he was under the influence of drugs. Hennessey testified that in the conversation which preceded the execution of the confession to the sexual assault offense here involved the defendant had mentioned that "he needed help because he kept doing this." The note which the defendant wrote upon this confession was construed by the officer to refer to that problem rather than to his present mental or physical condition. Hennessey also testified that after the defendant had given this confession[5] and stated that he must have been sick to have committed such a crime, the officer responded that he

---

[4] Conners testified that he noticed that the defendant limped when he got off his bicycle. He said that the defendant related that he had injured his left leg. Conners also testified that the defendant spoke very clearly, appeared to understand questions, and had control of his faculties.

[5] Hennessey on both direct and cross-examination testified that his promise was occasioned by the statement of the defendant after the second confession that he "was sick to have committed an act like that." At one point during his cross-examination Hennessey was asked whether it was possible that his promise was made at some time between the first and second confessions. He responded that he did not think so, but was not sure.

Brosko testified unequivocally that no discussion of psychiatric assistance took place until after the second confession. From this evidence the trier could reasonably have concluded that the second confession was not induced by the promise made by Hennessey.

would speak to a judge and a prosecutor in an effort to obtain some type of psychological help for the defendant. Since the defendant had confessed to the crime in question prior to the promise of assistance, which the officer carried out on the same day, we need not consider at this time whether the promise constituted an inducement. The finding of the trial court that the defendant voluntarily confessed with a full understanding of his rights is well supported by the evidence.

### III

The failure of the trial court to charge upon the issue of intoxication as negating a criminal intention is the basis for the next claim of error. The defendant filed a request for such a charge and also excepted to the refusal to grant his request. The state maintains that there was insufficient evidence to warrant a charge upon intoxication.

"Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate any element of the crime charged . . . ." General Statutes § 53a-7.[6] "Voluntary intoxication is a defense in a criminal action only where proof

---

[6] "[General Statutes] Sec. 53a-7. EFFECT OF INTOXICATION. Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged, provided when recklessness or criminal negligence is an element of the crime charged, if the actor, due to self-induced intoxication, is unaware of or disregards or fails to perceive a risk which he would have been aware of had he not been intoxicated, such unawareness, disregard or failure to perceive shall be immaterial. As used in this section, 'intoxication' means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body."

of specific intent is required as an element of the crime charged." *State* v. *Dennis,* 150 Conn. 245, 250, 188 A.2d 65 (1963). No specific intent is made an element of the crime of first degree sexual assault of which the defendant was convicted under the second count of the information. General Statutes § 53a-70 (a);[7] see *State* v. *Dennis,* supra, 251. Although a general intent to do the proscribed act is required for a crime of commission like sexual assault, voluntary intoxication is deemed to be irrelevant to its presence or absence. *State* v. *Bitting,* 162 Conn. 1, 7, 291 A.2d 240 (1971). Burglary in the first degree as charged in the first count of the information, however, requires unlawful entry or remaining in a building "with intent to commit a crime therein." General Statutes § 53a-101 (a);[8] see *State* v. *Sober,* 166 Conn. 81, 92, 347 A.2d 61 (1974). Intoxication would be relevant to negate such intent.

Although the defendant's request[9] was deficient in failing to confine the defense of intoxication to its bearing upon the mental element necessary for

[7] General Statutes § 53a-70 provides, in part, as follows: "(a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

[8] General Statutes § 53a-101 provides, in part, as follows: "(a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument . . . ."

[9] The defendant requested the following charge:
"DEFENDANT'S REQUEST TO CHARGE
". . . . 8. I do not propose to discuss with you nor is there need, that permanent condition of mental weakness which may come from long continued excessive indulgence in alcoholic liquor and or narcotics, and which has many of the aspects of insanity. The claim

burglary in the first degree, it was sufficient to alert the court to the need for such a charge, provided that there was sufficient evidence that the defendant was intoxicated when the crime occurred. General Statutes § 53a-7 defines intoxication as "a substantial disturbance of mental or physical capacities

in this case is not that the accused had permanently lost his ability to distinguish between right and wrong, but rather that because of the voluntary use of alcoholic liquor and or narcotics, be a sane man at the time it is charged that he committed the crime in question, was incapable of forming a rational intent or of controlling his will.

"Intoxication is a term which is used somewhat loosely in every day speech. We speak of a man as intoxicated when he discloses in his speech, his gait, his manner of his general appearance evidence of having taken intoxicating liquor to excess. Our Penal Code defines 'intoxication' as a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body.

"Voluntary intoxication is ordinarily no excuse for crime. It becomes significant only when it has proceeded so far that it affected the operation of the mind of the accused and made him incapable for the time being of forming a rational intent or of controlling his will. Its presence to that extent negatives the existence of a criminal intent.

"As we all know, this condition of intoxication varies in degree according to the amount and character of the intoxicating substance taken, the temperament of the man who takes it, the lapse of time between his taking it and the commission of the crime, and other circumstances you may reasonably consider. The law, I caution you, takes no account of differences in personal susceptibility to the effects of an intoxicating substance upon different individuals. An individual may show in his behavior the present effect of liquor he has taken and yet may still retain his faculties fully enough to reason, to know what he is about, and to form and carry out a rational intent. It is only when he is so under the influence of liquor or narcotics that at the time the crime was committed he was unable rationally to consider any matter or intelligently to harbor an intent or to control his activities that intoxication is a defense. If, upon the whole evidence, you entertain a reasonable doubt whether the condtion of the accused was such that he was still able to know what he was about and to form and carry out a rational intent, you must give to him the benefit of that doubt.
Wright's *Connecticut Jury Instructions,* Vol. II, Section 662, pgs. 1012, 1013."

resulting from the introduction of substances into the body." The only evidence that the defendant was intoxicated on May 16, 1979, when he entered the residence of the victim was her testimony that her assailant smelled of beer and certain statements contained in his confession to these crimes. These were to the effect that he had taken some "speed," had drunk some wine and had smoked about an ounce of "reefer"; that when he arrived at the general location of the crimes he was "really fucked up on speed, booze and reefer"; and that when he entered the home of the victim looking for a place to sleep he was too intoxicated to care if anybody else was there.

In contending that there was insufficient evidence of intoxication for submission of that question to the jury, the state relies upon several cases where there was merely evidence that a defendant had taken alcohol or drugs without any indication of an adverse effect upon his mental state. *State* v. *Roy,* 173 Conn. 35, 38–39, 47, 376 A.2d 391 (1977); *State* v. *Clemons,* 168 Conn. 395, 406, 363 A.2d 33, cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975); *People* v. *Morrison,* 58 App. Div. 2d 699, 396 N.Y.S.2d 92 (1977). In the case before us the defendant did describe in simple but explicit fashion the result upon him of the substances he claimed to have ingested. If the jury believed his assertion in the confession that he was so intoxicated that he entered the house only to find a place to sleep without being concerned about whether anyone was at home, they could not have found the "intent to commit a crime therein," which § 53a-101 (a) requires as an element of the offense. Since the state had the burden of proving this element, the quantum of evidence essential to warrant consider-

ation of the effect of intoxication on the defendant can be no greater than that which might have raised a reasonable doubt as to the existence of the specified mental state. The evidence of intoxication in this case was at least as great as that which we have regarded as sufficient in civil cases to justify submission of that issue to the jury. *Way* v. *Pavent,* 179 Conn. 377, 379–80, 426 A.2d 780 (1979); *Higgins* v. *Champ,* 161 Conn. 200, 203, 286 A.2d 313 (1971); see *Batick* v. *Seymour,* 186 Conn. 632, 640, 443 A.2d 471 (1982); *Craig* v. *Dunleavy,* 154 Conn. 100, 104–105, 221 A.2d 855 (1966). We conclude that the trial court did err in refusing to charge upon intoxication in relation to the specific intent required by § 53a-101 (a) for the offense of burglary in the first degree as charged in the first count of the information. A remand for a new trial on that count, therefore, is necessary.

## IV

The final claim of error made by the defendant is that the court confused the jury by reading to them General Statutes § 53a-70 (a) in its entirety and did not by its instructions limit them solely to the portion of the statute relied upon in the information. The state charged that the defendant had compelled the victim to engage in sexual intercourse by the use of force against her. The statute defines the offense as compelling a person to engage in sexual intercourse either "(1) by the use of force . . . or (2) by the threat of the use of force." The information did not include the latter alternative and the defendant duly excepted to the reading of that portion of the statute to the jury.

Although the entire statute was read, the court at no point in the ensuing discussion of the various elements made any reference to the "threat of the

use of force," but confined the jury wholly to a consideration of whether the defendant had used actual force against the victim.[10] The court had read the information to the jury before proceeding to the statute. The term "use of force" was defined in accordance with General Statutes § 53a-65 (7) (b)[11] as "the use of actual physical force or violence or superior physical strength against the victim."

After the jury had rendered their verdict of guilty on both counts of the information, the defendant requested that inquiry be made of the jury as to which of the two subsections of § 53a-70a had been relied upon.[12] The court then asked whether the jury had considered one or both subsections in finding the defendant guilty. The foreman responded that both had been considered.

---

[10] In concluding its discussion of the sexual assault offense the court charged: "If you, from all the testimony that you have heard, find that Mr. Carter forced . . . , against her will, to engage in an act of sexual intercourse by the actual use of physical force or by violence, or by the use of actual physical strength, then your verdict would be guilty. On the other hand, if the State has not proven this to your satisfaction beyond a reasonable doubt, then your verdict would be not guilty."

[11] General Statutes § 53a-65 provides, in part, as follows: "(7) 'Use of force' means: . . . (b) use of actual physical force or violence or superior physical strength against the victim."

The trial court did not refer to clause (a) of the definition, "Use of a dangerous instrument." The victim referred to the defendant's use of a knife, but said it might have been a letter opener because it was not sharp.

[12] The defendant also requested that a similar inquiry be made in respect to the crime of burglary in the first degree in the first count of the information, because General Statutes § 53a-101 (a) had been read in full to the jury. See footnote 8, supra. The information charged the defendant under the first subsection only. When the jury were asked which subsection they relied upon they responded that it was the first subsection "on the basis that he had the knife . . . on the premises." The defendant neither at trial nor on appeal has sought to pursue further any question in regard to the verdict upon the first degree burglary charge.

The state then requested that the jury be polled as to whether the verdict had been based upon the first subsection, the use of force against the victim, or the second subsection, the threat of use of such force. The defendant objected that the jury had already indicated that they considered both subsections. The court, acknowledging that the jury had said they *considered* both, remarked that the jury had not said they *held* the defendant under both subsections. The court then asked the jury whether they had held the defendant under the first subsection or the second. The first subsection, requiring the use of force against the victim, was then read and the court inquired whether that was the one under which the defendant had been found guilty. The jury responded affirmatively and they were then discharged.

The defendant contends that the response of the jury that they had considered both subsections in rendering their verdict of guilty of sexual assault in the first degree seriously prejudiced him. If that response had remained unclarified, there would be more substance to this claim of error. "Nothing is more elementary in criminal law than that an accused is required to defend only against the charge alleged." *State* v. *Genova,* 141 Conn. 565, 572, 107 A.2d 837 (1954) (*O'Sullivan, J.,* dissenting). The state is limited to proving that the defendant has committed the offense in substantially the manner described in the information. *State* v. *Ruiz,* 171 Conn. 264, 270, 368 A.2d 222 (1976). Although the reading of the inapplicable portion of § 53a-70 (a) did create some confusion, as indicated by the initial response of the jury that they had considered both subsections, it was ultimately dispelled. The final answer to the question

propounded by the court indicated clearly that the jury had found the defendant guilty as charged in the information of sexually assaulting the victim by the use of force in violation of the first subsection of the statute. There is, accordingly, no reasonable possibility that in rendering their verdict the jury were misled by any reference to the inapplicable portion of the statute. *State* v. *Ruiz,* supra, 272–74.

There is error in respect to the judgment upon the first count of the information charging burglary in the first degree, that judgment is vacated and the case is remanded for a new trial on that count in accordance with this opinion; there is no error in the judgment on the second count charging the defendant with sexual assault in the first degree.

In this opinion the other judges concurred.