## State of Connecticut *v.* Guillermo Aillon
### (12612)
### (12613)
### (12614)

Peters, C. J., Shea, Dannehy, Santaniello and Callahan, Js.

Argued January 9—decision released March 3, 1987

*John R. Williams,* for the appellant (defendant).

*Julia DiCocco Dewey,* assistant state's attorney, with whom were *Robert J. Devlin, Jr.,* assistant state's attorney, and, on the brief, *Arnold J. Markle,* state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this case is the propriety of several trial court rulings arising out of the alleged unavailability of an expert witness for the defense. The defendant, Guillermo Aillon, was charged by three separate indictments with having committed three murders in violation of General Statutes § 53a-54.[1] Two previous trials on these charges failed to result in a conclusive judgment of either conviction or acquittal. In the present third trial, a jury found him guilty on each of the indictments and the trial court, *Hadden, J.,* sentenced him to three consecutive terms of imprisonment for 25 years to life. The defendant appeals from this judgment. We find no error.

The charges against the defendant arose out of three killings that occcurred on August 14, 1972, when George Montano, his wife, Bernice Montano, and his

---

[1] General Statutes (Rev. to 1972) § 53a-54 provides in relevant part: "MUR-DER DEFINED. AFFIRMATIVE DEFENSES. EVIDENCE OF MENTAL CONDITION. CLASSIFICATION. (a) A person is guilty of murder when: (1) With intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime . . . ."

daughter, Barbara Aillon, the defendant's estranged wife, were stabbed to death. The defendant was tried on these charges in 1973, and convicted by a jury, but he was granted a new trial because of an improper ex parte conversation between the trial court and a member of the jury. *Aillon* v. *State,* 173 Conn. 334, 339–40, 377 A.2d 1087 (1977). The defendant's second trial, in 1978, ended with a declaration of mistrial after the jury failed to return a verdict. Thereafter, the defendant filed a motion for a judgment of acquittal arguing, inter alia, that his retrial constituted double jeopardy. That claim was twice rejected by the trial court and by this court. *State* v. *Aillon,* 189 Conn. 416, 421–22, 456 A.2d 279, cert. denied, 464 U.S. 837, 104 S. Ct. 124, 78 L. Ed. 2d 122 (1983); *State* v. *Aillon,* 182 Conn. 124, 130–31 n.5, 137–38, 438 A.2d 30 (1980), cert. denied, 449 U.S. 1090, 101 S. Ct. 883, 66 L. Ed. 2d 817 (1981). It was raised again in the context of two habeas corpus petitions alleging ineffective assistance of counsel. Only recently we upheld the dismissals of those petitions. *Aillon* v. *Manson,* 201 Conn. 675, 683–84, 519 A.2d 35 (1986). The present appeal arises out of the defendant's convictions at his third jury trial which began on July 23, 1984.

The defendant's appeal raises three claims of error. He maintains that: (1) the trial court, *Hadden, J.,* erred in precluding the defendant from offering the evidence of an expert hair analyst; (2) the trial court, *Hadden, J.,* erred in permitting the state to introduce statements and other evidence allegedly obtained as a result of an unconstitutional search and seizure; and (3) the trial court, *O'Sullivan, J.,* erred in refusing to dismiss the grand jury indictments despite a social connection between the grand jury foreman and the family of the victims.[2] We find none of these claims of error persuasive.

---

[2] The defendant's brief also raises a generalized claim of prejudice from the failure of the trial court, *Hadden, J.,* to grant his attorneys sufficient

## I

We will consider first the defendant's two part claim relating to the expert witness whose testimony was allegedly both unavailable and essential to his defense. The defendant's primary claim is that the trial court violated his state and federal constitutional rights to due process by denying his motion to admit the transcript of that witness' prior testimony at his first trial into evidence in this trial. Secondarily, the defendant claims that once the trial court excluded this evidence, the court erred in denying the defendant's request for a continuance to enable him to obtain the services of a substitute expert witness.

At each of the defendant's three trials, one of the links between the defendant and the murders was hair that was found on the bloody bedsheets and blanket in George Montano's bedroom. The state produced evidence from two FBI experts that this hair belonged to the defendant. At his first trial, the defendant contradicted this evidence through the testimony of Wellon D. Collom, a Pennsylvania criminologist, who asserted that there was no similarity between the hair found on George Montano's bedding and the defendant's hair. At the second trial, when Collom was physically ill, he did not testify in person, but a transcript of his 1973 testimony was read to the jury. At the third trial, however, the defendant was not permitted to have this transcript read to the jury. It is this ruling that underlies the defendant's first claim of error.

At the defendant's third trial, the defendant offered the following basis for having the transcript of Collom's

time to prepare for his third trial. At oral argument, however, the defendant made clear that this claimed prejudice was not a separate claim of error, but was intended to bolster his argument on the twin issues of the trial court's refusal to admit the former expert testimony and refusal to allow a continuance to obtain a substitute expert.

1973 testimony introduced into evidence. Conceding that Collom was not physically or mentally unable to testify, defense counsel alleged that he had been advised that Collom was not presently willing to hold himself out as an expert on hair "because he doesn't do that any longer." Accordingly, since the witness was no longer prepared to come into court and testify as an expert, the defense claimed the applicability of the exception to the hearsay rule allowing former testimony into evidence when the witness is "unavailable." See, e.g., Fed. R. Evid. 804; Practice Book §§ 793, 803;[3] *State* v. *DeFreitas,* 179 Conn. 431, 441–45, 426 A.2d 799 (1980); *State* v. *Parker,* 161 Conn. 500, 501–502, 289 A.2d 894 (1971); *State* v. *Weinrib,* 140 Conn. 247, 251, 99 A.2d 145 (1953); C. McCormick, Evidence (3d Ed. 1984) § 253. The state objected, contesting both the expertise and the unavailability of the witness. The

---

[3] "[Practice Book] Sec. 793. ——USE OF DEPOSITION

"So far as otherwise admissible under the rules of evidence, a deposition may be used as evidence at the trial or at any hearing if the deponent is unavailable, as defined in Sec. 803. Any deposition may also be used by any party for the purpose of contradicting or impeaching the testimony of the deponent as a witness. If only a part of a deposition is offered in evidence by a party, an adverse party may require him to offer, or he may himself offer, all of it which is relevant to the part offered."

"[Practice Book] Sec. 803. ——UNAVAILABILITY

" 'Unavailable' as used in Sec. 793 includes situations in which the deponent:

"(1) Is exempted by a ruling of the judicial authority on the ground of privilege from testifying concerning the subject matter of his deposition;

"(2) Persists in refusing to testify concerning the subject matter of his deposition despite an order of the judicial authority to do so;

"(3) Testifies to a lack of memory of the subject matter of his deposition;

"(4) Is unable to be present or to testify at a trial or hearing because of his death or physical or mental illness or infirmity; or

"(5) Is absent from the trial or hearing and the proponent of his deposition has been unable to procure his attendance by subpoena or by other reasonable means.

"A deponent is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is the result of the procurement or wrongdoing by the proponent of his deposition for the purpose of preventing the witness from attending or testifying."

trial court, after hearing argument, sustained the objection of the state, and the defendant duly excepted.

The defendant now renews his argument that, because the reputed lapse of Collom's expertise in hair analysis effectively rendered his testimony unavailable, and because a transcript of Collom's former testimony was reliable evidence, the trial court's exclusion of the former testimony violated his rights to due process of law under article first, § 8, of the Connecticut constitution and the fourteenth amendment to the United States constitution.[4] We disagree.

When a defendant offers evidence that is hearsay, his proffer runs counter to our well established preference for having a witness appear personally in court, under oath, so that his testimony can be subjected to cross-examination and his credibility adjudged in accordance with his demeanor. *State* v. *DeFreitas*, supra, 441, 445. This preference may be overcome by a showing that the proffered evidence is both reliable and necessary. *State* v. *Sharpe*, 195 Conn. 651, 664, 491 A.2d 345 (1985); *State* v. *Frye*, 182 Conn. 476, 480, 438 A.2d 735 (1980). Establishing a witness' unavailability because of physical or mental incapacity is one way of showing the necessity for the admission of hearsay evidence.

---

[4] Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by indictment or information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed."

The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

We recognize the force of the defendant's argument that there may well be circumstances in which constitutional considerations require expansion of the concept of unavailability, for the purposes of the hearsay exception, beyond the parameters of physical or mental incapacity. See generally *State* v. *DeFreitas,* supra, 442–43. Such an argument, however, is predicated on an assumption that the unavailability on which the defendant relies was factually demonstrated to the trial court. The record in the present case does not substantiate this assumption.

Even if we assume that, in this case, Collom's prior cross-examination establishes the reliability of his testimony; see *State* v. *Sharpe,* supra, 665; *State* v. *Parker,* supra, 504–505; C. McCormick, supra, § 255; it was still the defendant's burden to demonstrate its necessity by *proving* his unavailability. *State* v. *Frye,* supra, 480; C. McCormick, supra, § 253. Specifically, the defendant had to *prove* that Collom was in fact no longer prepared to testify as an expert. In the face of an objection by the state, the defendant did not satisfy his burden of proof through the unsupported representations of defense counsel that Collom was no longer qualified as an expert. So far as the record shows, the defendant made no attempt whatsoever to secure Collom's physical presence so that he might personally advise the court as to his present inability, or unwillingness, to testify as an expert hair analyst. "Due diligence to procure the attendance of the absent witness [is] . . . an essential . . . predicate of unavailability." *State* v. *Weinrib,* supra, 252; see also *United States* v. *Amaya,* 533 F.2d 188, 191 (5th Cir. 1976), cert. denied, 429 U.S. 1101, 97 S. Ct. 1125, 51 L. Ed. 2d 551 (1977); *Carter-Wallace, Inc.* v. *Otte,* 474 F.2d 529, 536 (2d Cir. 1972), cert. denied, 412 U.S. 929, 93 S. Ct. 2753, 37 L. Ed. 2d 156 (1973); Fed. R. Evid. 804 (a) (5). The defendant's failure to produce Collom denied the trial court the opportunity to question him in person to dis-

cern whether he was truly "unavailable" or merely recalcitrant. See *United States* v. *Zappola,* 646 F.2d 48, 54 (2d Cir. 1981). The defendant was obliged, at minimum, to make a good faith effort to procure Collom's attendance. Having failed to do so, he cannot now be heard to complain that the trial court's adverse evidentiary ruling constituted an abuse of its discretion. *State* v. *DeFreitas,* supra, 445; *State* v. *Jeustiniano,* 172 Conn. 275, 285, 374 A.2d 209 (1977).

The defendant argues that it was unnecessary to attempt to procure Collom's presence at trial because the trial court accepted defense counsel's representations that Collom was unwilling to testify as an expert. The record shows, however, that the trial court several times indicated an unwillingness to declare Collom unavailable when the witness apparently was physically able to testify.[5] The defendant, nonetheless, chose to rely exclusively on his counsel's representations concerning the absent witness' reluctance to testify as a predicate for establishing the witness' unavailability. We find nothing in the record to indicate that the trial court led the defendant to believe that it would be unnecessary, or futile, for him to attempt to procure Collom's attendance at trial in order to establish the unavailability of his testimony.

The defendant's final argument is that the trial court's interpretation of the hearsay exclusion for former tes-

---

[5] On September 18, 1984, for example, following defense counsel's attempt to characterize what Collom's testimony would be if brought before the court, the trial court responded: "I don't know what he is going to say when he gets on the stand. He hasn't gotten on the stand." Earlier, on September 14, defense counsel represented to the court that the state's attorney had agreed in a chambers conference to allow Collom's former testimony to be read into evidence. The state's attorney denied having made such an agreement. The trial court, which apparently had been present during the discussion at which the alleged agreement had been reached, corroborated the state's version: "There wasn't any question in my mind that Mr. Markle was telling you you bring Mr. [Collom] here, you'd better have him, Mr. Dakers, and words to that effect."

timony violated his state and federal constitutional rights by depriving the defendant of "crucial" evidence in his trial. Collom's testimony certainly would have aided the defendant in rebutting the state's evidence that the hair found at the murder scene belonged to him. Even without the hair evidence, however, there was more than sufficient additional evidence adduced at trial to permit the jury to find the defendant guilty as charged. That evidence included the following: (1) the defendant had threatened violence against his estranged wife, one of the murder victims; (2) the defendant was seen in the vicinity of the murder scene on the night of the murders; (3) the defendant lied to police about his activities on the night of the murders; (4) police officers located a serrated-edged knife, the type of weapon used in the murders, in the defendant's automobile on the night of the murders; (5) the blood types of two of the victims matched those of bloody items seized from the defendant's automobile; (6) blood found on one of the severed fingertips of a rubber glove, which had been found near the body of one of the murder victims, was of the same blood type as the defendant's, and the glove fragments matched the rubber gloves used at a laboratory at the Yale School of Medicine at which, prior to the murders, the defendant had attended an embalming class; and (7) two witnesses contradicted the defendant's alibi testimony that he had been at his sister's house from the early evening until midnight on the night of the murders. In light of this compelling evidence of the defendant's guilt, we are unpersuaded that the trial court's exclusion of Collom's former testimony violated the defendant's right to due process of law. See *State* v. *Ruth,* 181 Conn. 187, 197–99, 435 A.2d 3 (1980); *State* v. *Daniels,* 180 Conn. 101, 112, 429 A.2d 813 (1980).

Because the record does not show that the defendant ever attempted to procure the physical presence of the allegedly unavailable witness, and because the

jury could reasonably have found the defendant guilty from evidence independent of the hair testimony, we conclude that the trial court did not abuse its discretion in excluding the former testimony. This conclusion leads to a consideration of the defendant's alternate claim that, having excluded the only expert hair analysis testimony that the defendant was then prepared to offer, the trial court erred in denying his motion for a continuance to enable him to procure the testimony of another expert.

The trial court's ruling on the Collom transcript was made on September 13, 1984, four days before the conclusion of the defendant's third trial. Although the defendant's counsel had been alerted, some time during the previous month, that Collom no longer deemed himself qualified to testify as an expert, the defendant did not begin seeking a second expert on hair analysis until the day of the adverse ruling by the trial court. On the following day, and again on September 18, the last day of trial, the defendant moved for a continuance until October 1, 1984, to enable Dr. Peter DeForrest, who was temporarily out of the country, to examine, and testify about, the hair samples that were then in evidence. The state objected, and the trial court denied the motion. The defendant duly excepted.

The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion. *Ungar* v. *Sarafite,* 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921, reh. denied, 377 U.S. 925, 84 S. Ct. 1218, 12 L. Ed. 2d 217 (1964); *State* v. *Williams,* 200 Conn. 310, 320, 511 A.2d 1000 (1986); *State* v. *Marra,* 195 Conn. 421, 437–38, 489 A.2d 350 (1985). In this case, the defendant contends that the trial court's refusal to grant him a two week continuance to obtain DeForrest's testimony deprived him of his federal constitutional rights to compulsory process and due process of law. We disagree.

"There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar* v. *Sarafite,* supra; *State* v. *Williams,* supra; *State* v. *Bethea,* 167 Conn. 80, 84, 355 A.2d 6 (1974). A criminal defendant's right to present witnesses in his own defense is a fundamental element of due process of law. *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Bethea,* supra, 82–83. When a defendant seeks a continuance to obtain the presence of an absent witness, however, he bears the burden of providing a good faith justification for such a continuance. *State* v. *Gordon,* 197 Conn. 413, 424B, 504 A.2d 1020 (1985). To establish an abuse of discretion, the defendant must show that denial of the continuance demonstrably prejudiced his ability to defend himself. *State* v. *Beckenbach,* 198 Conn. 43, 52, 501 A.2d 752 (1985); *State* v. *Stanley,* 197 Conn. 309, 311–12, 497 A.2d 46 (1985); *State* v. *Marra,* supra.

Whether the defendant has been substantially prejudiced in this case is, on the present state of the record, a matter of conjecture. We have found prejudice, and an abuse of discretion, when a defendant was denied a continuance to obtain the testimony of a witness whose testimony was of substantial value to the defendant's cause because it was known to be exculpatory. *State* v. *Williams,* supra, 315–18, 321; see also *Wilkerson* v. *Turner,* 693 F.2d 121, 124 (11th Cir. 1982); *Singleton* v. *Lefkowitz,* 583 F.2d 618, 624 (2d Cir. 1978), cert. denied sub nom. *Abrams* v. *Singleton,* 440 U.S. 929, 99 S. Ct. 1266, 59 L. Ed. 2d 486 (1979). This defendant, by contrast, failed to make any evidentiary showing that DeForrest's testimony would have aided the defense in any manner. The defendant's request for a continuance was based solely on his counsel's repre-

sentation that DeForrest was willing to analyze the hair evidence and "would be in a position to testify" on October 1, 1984. The record does not show that DeForrest ever analyzed the evidence, let alone that his testimony would have been favorable to the defendant. Having failed to make more than a speculative showing of prejudice, the defendant has necessarily failed to demonstrate that the trial court abused its discretion in denying his motion for a continuance.

## II

We now turn to the defendant's second claim of error, which alleges that the trial court's refusal to suppress certain incriminating evidence violated his state and federal constitutional rights against unreasonable search and seizure.[6] According to his motion to suppress, the allegedly illegal evidence consisted of "any and all information" derived from the stop of the defendant's automobile by North Haven police officers early in the morning of August 14, 1972, shortly after the occurrence of the murders with which the defendant was charged.[7] The defendant claims that the stop

---

[6] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

The fourth amendment to the United States constitution, made binding on the states through the constitution's fourteenth amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[7] This motion was filed on August 2, 1984. At the defendant's first trial in 1978, he filed a motion to suppress all property seized during subsequent police searches of his automobile and apartment. The latter motion was refiled by the defendant on May 21, 1984. The trial court denied the motions to suppress as to the stop and subsequent automobile searches. On appeal, the defendant bases his claim of error on the admission into evidence of "the fruits of a warrantless search of the defendant's automobile." We presume, therefore, that the defendant is not challenging the trial court's rul-

violated his constitutional rights because the police lacked sufficient cause to detain him. We disagree.

At the trial court hearings on the defendant's suppression motions, the following facts emerged concerning the circumstances surrounding the allegedly illegal stop. At approximately 1 a.m. on August 14, 1972, Hamden police officer Pasquale Natale was notified of a possible burglary at a power equipment store in the vicinity of his patrol. On his way to the store, Natale noticed an automobile, subsequently determined to be the defendant's, travelling without illuminated headlights. He then saw the automobile being pulled over by a North Haven police cruiser. Natale contacted his dispatcher, requesting information on the automobile and its driver and, if possible, that the driver be detained pending investigation of the burglary. He then proceeded to the power equipment store, where he confirmed that a burglary had occurred.

The North Haven police officer whom Natale had observed was Officer Edward Murphy, who had stopped the defendant's automobile on State Street in North Haven between 12:30 and 1 a.m. on August 14. Murphy had stopped the defendant because his automobile had had a loud muffler and its rear marker plate had not been illuminated. After orally warning the defendant to repair the violations, Murphy allowed him to proceed.

Shortly thereafter, Murphy learned from a radio dispatch that the driver he had stopped was a suspect in the burglary of the power equipment store. He notified other patrols to look out for the automobile. He and

ing as to property obtained in a police search conducted pursuant to a warrant obtained on August 17, 1982, which the defendant also sought, unsuccessfully, to suppress. Insofar as the record indicates, the only warrantless searches of the defendant's automobile occurred during the stop on the morning of August 14, 1972, and on the afternoon of the same day, when police seized a knife, later introduced into evidence as an exhibit for identification, from the defendant's automobile while it was being repaired at a muffler shop.

two other North Haven police officers soon observed the defendant's automobile heading northbound, in the direction of Wallingford. One of the other officers, Kerwin Daniels, signalled the defendant to pull over. After a brief hesitation, the defendant drove into a Farm Shop parking lot across the street.

After the defendant stopped his automobile, Daniels asked to see the defendant's license and registration. While Murphy examined these documents, Daniels shone a flashlight inside the defendant's automobile. In the back seat, he observed what appeared to be a knife handle protruding from a bundle of clothing. Daniels asked the defendant if the object was a knife, and the defendant replied affirmatively. Although the defendant initially declined Daniels' request to show him the knife, he subsequently retrieved it upon the request of Sergeant Hayes Gibson, the third officer present at the scene of the stop. The knife was approximately ten inches long, with a serrated edge, and stained with what appeared to be blood. The defendant explained that the stains were juices from meat that he had cut at a barbecue earlier in the evening. Once the police officers had finished examining the knife, they returned it to the defendant. The officers then asked for and received the defendant's permission to examine the trunk of his automobile. Finding no evidence of a burglary, the officers released the defendant with a written warning for his defective muffler and marker plate light. The entire stop lasted approximately fifteen minutes.

The constitutional issue raised by this brief detention is whether the actions of the North Haven police officers exceeded the permissible limits of an investigative stop under *Terry* v. *Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). In his brief, the defendant argued for a broader inquiry, relying upon both the federal constitution and the strict standards of proba-

ble cause articulated by this court in *State* v. *Kimbro,* 197 Conn. 219, 233–38, 496 A.2d 498 (1985). At oral argument, however, defense counsel conceded that the precise issue before this court is not whether the police had probable cause to arrest the defendant but rather whether the investigative stop was justified by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry* v. *Ohio,* supra, 21; *United States* v. *Cortez,* 449 U.S. 411, 417–18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981), reh. denied, 455 U.S. 1008, 102 S. Ct. 1648, 71 L. Ed. 2d 877 (1982); *State* v. *Aversa,* 197 Conn. 685, 690, 501 A.2d 370 (1985); *State* v. *Braxton,* 196 Conn. 685, 688–89, 495 A.2d 273 (1985); *State* v. *Watson,* 165 Conn. 577, 585, 345 A.2d 532 (1973), cert. denied, 416 U.S. 960, 94 S. Ct. 1977, 40 L. Ed. 2d 311 (1974); 3 W. LaFave, Search and Seizure (1978) § 9.2. What constitutes a reasonable and articulable suspicion depends on the totality of the circumstances. *United States* v. *Cortez,* supra, 417; *State* v. *Aversa,* supra. In reviewing the police officers' actions in this case, we must determine, first, whether the stop was justified at its inception, and second, whether the ensuing police response was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry* v. *Ohio,* supra, 19–20; *United States* v. *Sharpe,* 470 U.S. 675, 682, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985); *State* v. *Braxton,* supra.

The defendant contends that the North Haven police had no justification for stopping him for a second time near the Farm Shop because Officer Murphy had previously stopped and released him on State Street. The defendant does not challenge the validity of the first stop, but maintains that, once Murphy examined his driver's documents and determined that there were no grounds for further detaining him, any subsequent investigative stop was per se unjustified and unconstitutional. We disagree. It may well be that a second police stop for the same motor vehicle violations that

prompted Murphy's first stop would have been unjustifiable. The second stop, however, had a different impetus. That stop was designed to investigate whether the defendant might be a suspect in a nearby burglary of which Murphy was unaware when he made the first stop. "One function of a constitutionally permissible *Terry* stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime." *State* v. *Braxton,* supra, 689.

When the North Haven police stopped the defendant for a second time to determine his possible involvement in the nearby burglary, they had sufficient reasonable and articulable grounds to justify that investigative detention at its inception. The challenged stop occurred only minutes after the defendant's automobile had been seen in the vicinity of the burglary, which had only recently occurred. "Proximity in time and place of the stop to the crime is highly significant" in the determination of whether an investigatory detention is justified by reasonable and articulable suspicion. *State* v. *Aversa,* supra, 691; *State* v. *Carter,* 189 Conn. 611, 616–17, 458 A.2d 369 (1983); 3 W. LaFave, supra, § 9.3 (d). The defendant's automobile had been observed travelling without illuminated headlights, in the pre-dawn hours of the morning. See *United States* v. *Holland,* 510 F.2d 453, 454–55 (9th Cir.), cert. denied, 422 U.S. 1010, 95 S. Ct. 2634, 45 L. Ed. 2d 674 (1975); *State* v. *Cardinal,* 194 Conn. 114, 117–18, 478 A.2d 610 (1984); see generally *State* v. *Aversa,* supra, 691; *State* v. *Paoletto,* 181 Conn. 172, 174, 434 A.2d 954 (1980). Taken together, these facts warranted detaining the defendant to inquire whether he might possibly be a burglary suspect. "Even if the circumstances are such that no one person can be singled out as the probable offender, the police must sometimes be allowed to take some action intermediate to that of

arrest and nonseizure scrutiny." 3 W. LaFave, supra, § 9.3 (d), p. 84; see also *United States* v. *Holland,* supra, 455.

A *Terry* stop that is justified at its inception will pass constitutional muster only if the ensuing police investigation is reasonably related to the purposes of the stop. Like the determination of initial justification, this inquiry is fact-bound. *State* v. *Braxton,* supra. "The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." *State* v. *Watson,* supra, 585; *State* v. *Januszewski,* 182 Conn. 142, 149, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981).

In the course of investigating the burglary, it was reasonable for the North Haven police to confirm the defendant's identity by inspecting his motor vehicle documents and to seek an explanation of his activities at the time of the burglary. It was also reasonable for the officers to conduct a visual inspection of the defendant's automobile, aided by a flashlight in the absence of natural illumination, to determine whether the automobile contained items taken from the burglary or burglary tools. See *State* v. *Graham,* 200 Conn. 9, 20, 509 A.2d 493 (1986). Upon discovering the knife in the defendant's automobile, and discerning that it was stained with what appeared to be blood, the officers had the right, and the duty, to inspect the weapon and inquire into the defendant's reason for having it in his automobile. The officers did not display their guns, nor search the defendant's person, nor physically restrain the defendant. See generally *State* v. *Januszewski,* supra, 150 (minimal restriction upon defendant's lib-

erty in motor vehicle stop was not unreasonable under circumstances). The stop lasted only fifteen minutes. "The brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." *United States* v. *Place,* 462 U.S. 696, 709, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983); *United States* v. *Sharpe,* supra, 685. We conclude, therefore, that the police officers' actions were justified by the legitimate purpose of the stop. Accordingly, the trial court did not err in admitting the fruits of the stop into evidence at the defendant's trial.

## III

The defendant's third and final claim of error asserts that the indictments under which he was prosecuted should have been dismissed because the foreman of the indicting grand jury was acquainted with one of the murder victims and his family. The defendant claims that his constitutional rights to due process were violated when he was deprived of the opportunity to inquire into a friendship between the grand jury foreman and the family of George Montano. The trial court, *O'Sullivan, J.,* although alerted to the fact of this friendship, refused to permit the defendant to conduct a voir dire of the foreman, or to present witnesses to testify about his relationship with the Montano family. We find no error.

The defendant's claimed right to undertake a voir dire of a member of the grand jury is fatally undermined by our recent decision in *State* v. *Simms,* 201 Conn. 395, 399–404, 518 A.2d 35 (1986). In *Simms,* where a defendant sought to conduct such an inquiry to ascertain the effects of adverse pretrial publicity, we concluded that the state constitutional right to a

disinterested grand jury[8] does not create a concomitant right to voir dire prospective grand jurors. Id. The defendant's asserted right to call witnesses to testify to the relationship of the grand jury foreman with the Montanos similarly lacks a constitutional foundation. "If we were to require a full-scale investigation of a grand jury panel upon unsubstantiated assertions that the panel had been improperly drawn, we would be . . . opening the door to postindictment scrutiny of virtually every grand jury panel, no matter how impartial and representative in fact." Id., 402.

Here, as in *Simms,* the defendant has failed to show that the grand jury foreman's relationship with the family of the murder victims prejudiced the defendant's cause before the grand jury. On the contrary, the record indicates that the foreman informed the trial court of his acquaintance with the victims before being empanelled, and unequivocally assured the court that this circumstance would have no effect on his deliberations. We therefore conclude that the defendant has failed to meet his burden of showing actual prejudice on the part of the grand jury. Id., 403; see also *United States* v. *Burke,* 700 F.2d 70, 82 (2d Cir.), cert. denied, 464 U.S. 816, 104 S. Ct. 72, 78 L. Ed. 2d 85 (1983).

There is no error.

In this opinion the other justices concurred.

---

[8] See *State* v. *Menillo,* 159 Conn. 264, 275, 268 A.2d 667 (1970).