STATE OF CONNECTICUT *v.* ROBERT M. BROWN
(SC 15481)

Callahan, C. J., and Borden, Berdon, Palmer and McDonald, Js.

Argued March 18—officially released August 12, 1997

*Rita M. Shair*, assistant state's attorney, with whom was *James E. Thomas*, state's attorney, for the appellant (state).

*G. Douglas Nash*, public defender, for the appellee (defendant).

*Opinion*

CALLAHAN, C. J. The certified issue in this appeal is whether the Appellate Court properly concluded that the trial court's denial of the defendant's midtrial motion for a continuance to allow for DNA[1] testing was an abuse of its discretion that entitled the defendant

---

[1] "DNA is the abbreviation for deoxyribonucleic acid. See generally *State* v. *Sivri*, 231 Conn. 115, 151–62, 646 A.2d 169 (1994); *State* v. *Skipper*, 228 Conn. 610, 613–24, 637 A.2d 1101 (1994)." *State* v. *Morales*, 232 Conn. 707, 713, 657 A.2d 585 (1995).

to a new trial.[2] In the interests of judicial economy, however, we also address the defendant's related claims that were not decided by the Appellate Court, namely, that: (1) the trial court improperly denied his posttrial motion for a new trial; and (2) the state's late disclosure of certain physical evidence deprived the defendant of several of his constitutional rights. We reverse the judgment of the Appellate Court as to the certified issue and affirm the judgment of the trial court as to the issues raised before, but not decided by, the Appellate Court.[3]

The jury reasonably could have found the following facts. In mid-July 1983,[4] the victim placed an advertisement in a local newspaper seeking a roommate to share her condominium in Suffield. At 10:45 a.m. on July 24, the defendant, Robert M. Brown, called the victim and indicated that he was inquiring about the condominium for his sister, a legal secretary who was relocating to this area from Florida. At the end of the conversation, the defendant told the victim, "we'll be over" around noon.

At noon, the victim saw the defendant walking briskly toward her front door. By the time she was able to get to the door, he had already entered the foyer. The defendant explained that he had called earlier concerning the condominium. The victim then spent several minutes showing the defendant around the condomin-

---

[2] We certified the following questions: "Did the Appellate Court properly conclude that (1) the trial court abused its discretion in denying the defendant's motion for a continuance for DNA testing, and (2) the error was so prejudicial that it denied the defendant a fair trial?" *State* v. *Brown,* 238 Conn. 901, 677 A.2d 1376 (1996).

[3] The defendant initially appealed directly to this court pursuant to General Statutes § 51-199 (b). We subsequently transferred the case to the Appellate Court pursuant to Practice Book § 4023.

[4] Although the incident took place in 1983, this trial did not take place until 1993, because the defendant had been in prison in New Hampshire on an unrelated sexual assault conviction. Furthermore, the July, 1993 trial followed an earlier mistrial in March, 1993.

ium. When they were on the second floor, where the bedrooms were located, the defendant appeared disinterested when the victim showed him the empty bedroom to be rented.

After briefly using the bathroom off the empty bedroom, the defendant entered the victim's bedroom and stood in the doorway. He asked if the bedroom was the victim's and whether certain of the doors were closet doors. After the victim responded that it was her bedroom and that there were walk-in closets behind the closed doors, she began to feel uncomfortable and attempted to leave the room. As she passed the defendant in the doorway, he grabbed her from behind with his left arm and cupped his left hand over her mouth. In his right hand, he held a knife with a five or six inch curved blade that he displayed to the victim. After a brief struggle, the defendant ordered the victim to remove her eyeglasses. After she had done so, the defendant dragged her approximately six feet into the nearest walk-in closet.

Once in the closet, the defendant continued to hold the victim with his left arm. With his right arm, he began rummaging through her clothes and found a tie to a tunic top. He then led her out of the closet and removed a pair of tube socks from a dresser drawer. The defendant ordered the victim to lie face down on her bed. After pressing the victim's face into the bed, he gagged her with one of the socks.[5] He also tied her hands behind her back with the tie he had taken from the closet. He then ordered her to turn onto her back. While he was binding and gagging the victim, he repeatedly ordered her not to scream.

The defendant then proceeded to lie on the victim and, after forcibly removing her jeans and underwear,

---

[5] The gag was loose enough so that the victim could still communicate with the defendant.

had vaginal intercourse with her. After some time, the defendant abruptly separated himself from the victim and went into the bathroom.[6]

In the bathroom, the defendant searched the cabinets until he located a disposable douche. After ordering the victim to squat down over the toilet he twice unsuccessfully attempted to insert the douche applicator into her vagina. On the third attempt, he succeeded and released the fluid contained therein into the victim. The defendant then removed the applicator and wiped the victim's vaginal area with a yellow hand towel. When he had finished, he ordered the victim to return to the bedroom and lie on the bed. The defendant then wiped down the toilet with the towel. He also asked the victim for a bag in which he could put the used douche applicator, and she provided him with a bag for that purpose.

The defendant then returned to the bedroom and sat down next to the victim. At that point, she told him that she suffered from hypoglycemia, that her blood sugar level was low and that she felt nauseated and dizzy. In response, the defendant told her that she was only afraid. He also remarked that they could get into a lot of trouble for what they had just done. He further told the victim that he did not want to hurt anyone, but that if he got into trouble he had "friends" who could "take care of things" for him. After some brief additional conversation, the defendant pushed the victim down onto the bed and announced that he was considering raping her again. The defendant then covered the victim's eyes with a pillowcase and penetrated her digitally. She told him that it hurt, and he stopped.

At that point, he asked the victim if she was expecting anyone. In response, she reminded him of the advertisement in the newspaper. The defendant then picked up the bag containing the douche applicator and hurriedly

---

[6] The victim was unable to tell whether the defendant had ejaculated.

left the condominium. Shortly thereafter, the victim was taken by a neighbor to a nearby hospital where a rape kit was constructed. While the victim was at the hospital, hospital personnel called the police and, shortly thereafter, a member of the Suffield police arrived to take a statement from the victim. The next day the victim met with a police sketch artist who composed a picture of her attacker based on her description. The victim also looked at several hundred police photographs that day but did not select any of the photographs as being that of her assailant.[7]

Approximately ten weeks later, after the defendant had responded to another classified advertisement in another town placed by a woman seeking a roommate,[8] the victim was shown an array of five photographs, including one of the defendant. At that time, the victim positively selected the defendant's photograph as a photograph of her assailant. The defendant subsequently was arrested and tried by a jury on three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a), one count of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A) and one count of burglary in the first degree in violation of General Statutes § 53a-101 (a) (1).[9] The jury

[7] There is no indication in the record that any of the photographs viewed by the victim at that time were of the defendant.

[8] The defendant's suspicious activity led the woman whose apartment he had entered to connect him with the present case, which she had heard about through the media. On that basis, she contacted the police and told them of the similarity between her incident and that involving the victim. As a result, the defendant's picture was placed in the photographic array that the victim viewed.

[9] General Statutes § 53a-70 provides in relevant part: "(a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person . . . or by the threat of use of force against such other person . . . which reasonably causes such person to fear physical injury to such person . . . ."

The defendant was charged with one count of sexual assault in the first degree for each of the following acts: (1) the initial vaginal intercourse with

returned a verdict of guilty on each count, and the trial court subsequently sentenced the defendant to a total effective sentence of imprisonment of fifty-one years, suspended after thirty-nine years, and five years probation.

I

We first address the state's claim that the Appellate Court erred in concluding that the trial court had abused its discretion by denying the defendant's midtrial motion for a lengthy continuance so that DNA testing could be performed on a stain found in the crotch area of the jeans that the victim had been wearing before and after she was assaulted. The Appellate Court concluded that the trial court had abused its discretion by denying the continuance and allowing the jury to deliberate and to reach a verdict in this case before DNA testing of the stain had been completed. *State* v. *Brown,* 41 Conn. App. 317, 323, 675 A.2d 1369 (1996). We disagree with the Appellate Court on this issue.

" 'The determination of whether to grant a request for a continuance is within the discretion of the trial court, and will not be disturbed on appeal absent an abuse of discretion.' *State* v. *Aillon,* 202 Conn. 385, 394, 521 A.2d 555 (1987). A reviewing court is bound by the principle that '[e]very reasonable presumption in favor of the proper exercise of the trial court's discretion will be made.' *Ridgeway* v. *Ridgeway,* 180 Conn. 533, 538,

the victim; (2) the insertion of the douche applicator; and (3) the subsequent digital penetration of the victim.

General Statutes § 53a-92 provides in relevant part: "(a) A person is guilty of kidnapping in the first degree when he abducts another person and . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually . . . ."

General Statutes § 53a-101 provides in relevant part: "(a) A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with . . . a deadly weapon or dangerous instrument . . . ."

429 A.2d 801 (1980); *State* v. *Beckenbach,* [198 Conn. 43, 47, 501 A.2d 752 (1985)]." *State* v. *Hamilton,* 228 Conn. 234, 239–40, 636 A.2d 760 (1994). When determining whether a new trial is required as the result of a trial court's denial of a request for a continuance, we first must determine whether the trial court's decision denying the request for a continuance was "arbitrary" or "unreasonabl[e]." Id., 240–42. This determination must be made on a case-by-case basis, with particular reference to the circumstances presented to and known by the trial court at the time of its ruling. Id., 240.

"There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." (Internal quotation marks omitted.) Id., 240. Under the particular facts of this case, the trial court's action was not only reasonable, but represented a thoughtful balancing of the numerous competing interests known to the court at the time it rendered its decision.

The following additional facts are relevant. At trial, the presentation of the state's witnesses took from Tuesday, July 13, until Thursday, July 15, 1993. At the end of the day on July 15, after the state had presented its final witness, the defendant was allowed to place on the record information regarding the whereabouts of the jeans that the victim had worn before and after the sexual assaults. The defendant informed the court, through counsel, that: (1) the jeans had been located only recently at the Suffield police department; (2) there was a stain on them containing seminal fluid protein; and (3) the stain had never been tested for blood type or DNA to determine its source. The defendant represented to the court that it was still unknown whether testing would be of any use because of the ten years

that had elapsed since the jeans had been collected but that the state was looking into the matter. The court informed the parties that because so little was known about the jeans or the stain at that time and because no formal motion had been made, he was inclined to continue with the presentation of evidence until more helpful information became available and a motion was made. Neither side voiced any objection to the court's approach at that point.[10]

Before the defendant began to present evidence on the morning of Friday, July 16, there was an additional colloquy on the record between the court and counsel. Both attorneys indicated that they had been operating under the assumption that the jeans had been lost, but that it had recently come to their attention that the jeans were in fact in the possession of the Suffield police department. The defendant then made an oral motion to have the jeans tested for DNA. He represented to the court that he believed that a "preliminary report" could be prepared within twenty-one days. The state objected, stating that it did not believe that a continuance for several weeks was necessary at that point.

---

[10] The following colloquy took place between the court and defense counsel at the end of the day on July 15:

"The Court: If [the jeans] were in the custody of a lab, and the lab had found the stains to exist, why, maybe they would have been preserved. But see what—let's continue to develop facts, and, as the facts come in, at such time as you wish to make a motion—right now, except for one witness out of turn, you haven't put any evidence on. And, you know, if at the end of Friday we're out of witnesses, and you want the weekend to make a motion, I find it hard to believe that I'm going to force you to formally rest on Friday at 3 p.m. instead of giving you until Tuesday morning at least. But it's possible, I suppose. We'll never know unless the facts are developed, either by stipulation or, if necessary, by evidentiary hearing, and somebody makes a motion for me to do something. Otherwise, the trial will just roll along. It seems reasonable enough. But if we just stop because of the possibility that something may occur that may cause us to want to have more time later, we'll never get finished.

"[Defense Counsel]: And I'm not asking that, Your Honor. I just wanted to put those facts on the record."

The court denied the requested three week continuance stating that, from its knowledge of DNA testing, it was highly "pessimistic of any meaningful results from the test . . . ." In denying the continuance, however, the court indicated that after a verdict was returned, the defendant should file a motion for a new trial and that, in connection with that motion, the court would order the testing of the jeans. The court also stated that it would delay sentencing until the testing on the jeans had been completed. In summing up its basis for proceeding to a verdict and ruling on the defendant's motion for a new trial once the test results, if any, were known, the court stated that "if the DNA test produces a result one way or the other, we can make sure that justice is served at that point, and the net impact will not be a delay at all. And, indeed, it will resolve the matter quicker than continuing this case, which would, in essence, be a mistrial. And I don't think it would be fair to bring a jury back in a month or two months. Surely, if the test—if the state does it—if I continue the case, and the state does a test, and it says the DNA material is the defendant's material, then it would not surprise me for the defense to ask for a test, a separate test, and I'd probably grant that. And then the jury would be back here in, perhaps, October or November. And to ask them to remember the July testimony, having gone back to their lives, would not be very fair to them. . . . All of this assumes that there's going to be a sample in these ten-year-old jeans, that has not been refrigerated in any manner, that's going to be able to be meaningfully tested. So we are way down the factual pike, and further down the pike than we'll ever get. But, in any event, we can deal with each of those facts as it goes." Finally, the court acceded to the defendant's request to permit him to delay formally resting his case until the following Tuesday, July 20, which was the next scheduled court date, so that he

could present to the jury any new evidence pertaining to the jeans that might become available over the weekend.[11]

The defendant then began to present his defense. He called to the stand Sanders Hawkins, the state's chief toxicologist. In response to the defendant's questioning, Hawkins testified that no semen had been found in the rape kit samples that had been taken from the victim's mouth, rectal area and vaginal area shortly after the assaults. Hawkins stated that his laboratory had examined the victim's bedspread, as well as the hand towel that had been used to wipe the victim's vaginal area after the douching had been completed, and that neither item contained any seminal fluid. Hawkins also testified that his laboratory had examined the victim's shirt and jeans, and that a seminal stain had been found on the crotch area of the victim's jeans, but that that stain had not been tested for blood type when the evidence was first received in 1983.[12] The jeans thereafter apparently had been returned to the Suffield police department.

The defendant then questioned Hawkins regarding the fact that no DNA testing had been performed on the stain on the jeans. Hawkins testified that DNA testing had not been available for rape cases in 1983, but that DNA testing had become available sometime thereafter. He added, however, that he could not give an opinion as to whether the stain on the jeans in this case could have been tested because he had not seen it and, therefore, did not know the condition or size of the sample. On cross-examination, Hawkins testified that all of the work on the evidence in this case had been done in August, 1983, and that any test results and

---

[11] The state did not object to the defendant's request.

[12] Hawkins explained that it would have been of little use for his laboratory to have tested the stain for blood type in 1983 because they did not have a blood sample from the defendant at that time.

procedures used by his laboratory are equally available to the defense and the state.[13]

On Tuesday morning, before the jury was brought into the courtroom, counsel for both the state and the defendant presented the court with updated information pertaining to the stain on the jeans. The state represented to the court that some preliminary blood grouping testing had been done on the jeans but that, because the victim and the defendant shared the same blood grouping, the results were inconclusive with respect to identifying the defendant as the depositor of the stain. The state also noted that blood subgrouping tests, which might provide more useful results, could be done but that such testing would take an additional two to three days. The state also pointed out that no DNA testing had been done up until that point, and that it was not known whether there was a sufficient sample to conduct such testing.

The defendant then renewed his motion for a continuance. In response to an inquiry from the court regarding the projected length of the proposed continuance, the defendant made clear that he sought sufficient time for both the blood subgrouping testing as well as DNA testing. In response, the court pointed out to the parties that the state was at a greater risk if the case proceeded to a verdict because the state would not be allowed to retry the defendant if he was acquitted and the DNA testing subsequently yielded inculpatory results. In con-

---

[13] The entire cross-examination was as follows:

"[State's Attorney]: Doctor, the test[s] that you've referred to that are embodied in the reports you referred to this morning, were they all done in August of 1983?

"[Hawkins]: To the best of my knowledge, yes. That's what the report says.

"[State's Attorney]: And the testing that you do, are the results thereof and the procedures that you use, are they available to the defense equally as well as to the prosecution?

"[Hawkins]: Sure.

"[State's Attorney]: Thank you, sir."

trast, if the defendant was convicted and the DNA test results were exculpatory, the defendant probably would succeed on his motion for a new trial. The state represented that it understood the risk and that it had communicated that risk to the victim, who was then residing in Germany but had returned to Connecticut to testify at the trial, and that the state and the victim agreed that the case nonetheless should be given to the jury without further delay.

The court again denied the defendant's motion for a continuance "on the theory that subsequent testing will be done in the context of the court's orders in conjunction with a motion for a new trial, because I think we have a fair and complete set of evidence that both parties were prepared to try the case on. I know this is the second time this case has started, having started earlier in March, only to be mistried by some other piece of evidence which had arisen in an unusual fashion. So that I think the interest of justice is served by letting this jury, some of whose members we had promised to finish this week or next at the latest, so that they won't be rushed, to let this jury go to verdict with the evidence that they have. And if there is, indeed, evidence of significance that did not come before them, we'll deal with that in a motion for a new trial."[14]

---

[14] After the court denied his motion for a continuance, the defendant sought to protect the record for appeal by moving for a mistrial based on the fact that "there is a piece of evidence that's out there that needs to be tested." The court denied the motion for a mistrial. On appeal to the Appellate Court, the defendant claimed that the trial court should have granted him either a continuance or a mistrial, and the Appellate Court concluded that either remedy would have been appropriate. For the same reasons that we conclude that the trial court's refusal to grant a continuance was reasonable, we also conclude that the trial court did not rule improperly in denying the motion for a mistrial. See State v. Traficonda, 223 Conn. 273, 282, 612 A.2d 45 (1992) (decision to grant mistrial within sound discretion of trial court, and defendant bears heavy burden of proving occurrence was so prejudicial as to vitiate proceedings).

.

Shortly thereafter, the jury was brought in and closing arguments were presented by counsel. In closing, the defendant emphasized to the jury the lack of scientific evidence connecting him to the crime. "I would suggest to you, ladies and gentlemen, that it's the forensic, the scientific evidence, which is not like human testimony in the sense that it rarely, if ever, makes a mistake. You have the hospital records of [the victim]. They indicate that no sperm was found. . . . You heard evidence concerning the toxicology reports, the lab reports. There is not one piece of physical evidence in this entire case that ties [the defendant] to this crime. The yellow towel that [the victim] indicated was used to clean her was tested and nothing was found on that yellow towel, according to Dr. Hawkins. The jeans that had a semen stain were apparently never tested. The state, apparently, has not introduced evidence concerning any kind of testing, whether it be blood typing or DNA. And the defense, as pointed out by the state, had equal availability for the evidence. But the burden of proof, ladies and gentlemen, is on the state, not on the defense. Just please keep that in mind when you consider that piece of evidence." The following day, the jury returned a verdict of guilty on all counts.

As the defendant points out, we concluded in *State v. Hamilton*, supra, 228 Conn. 242, that "an appellate court should limit its assessment of the reasonableness of the trial court's exercise of its discretion to a consideration of those factors, on the record, that were presented to the trial court, or of which that court was aware, at the time of its ruling on the motion for a continuance." The unique facts of this case known to the trial court at the time it ruled on the defendant's final motion for a continuance on the last day of evidence point ineluctably to the conclusion that the trial court's decision not to grant the requested continuance

was neither arbitrary nor unreasonable. We therefore reverse the judgment of the Appellate Court.

The first relevant fact before the trial court was that the seminal fluid protein found on the jeans logically could not be connected to the sexual assault in issue. See *State* v. *Damon*, 214 Conn. 146, 160, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990) (no indication that witness for whom continuance was sought would provide testimony favorable to defendant); *State* v. *Aillon*, supra, 202 Conn. 395–96 ("counsel's representation that [the witness] was willing to analyze the hair evidence and 'would be in a position to testify' " speculative and insufficient to require continuance). It is uncontroverted that the attacker removed the victim's jeans and underwear and threw them on the floor before the first assault occurred.[15] It is further uncontroverted that the attacker forced the victim to submit to douching after he had intercourse with her and that he subsequently wiped her vaginal area with a towel. Only after the attacker had engaged in these precautions to ensure that no semen was present and had left the condominium did the victim put her jeans back on. The trial court also knew, at the time it denied the defendant's motion for a continuance, that the attacker's efforts to remove any trace of semen from the victim and the scene apparently had been successful, given the fact that no trace of semen was found in or around the victim's vaginal area and that there was no semen on either the towel or the victim's bedspread. The trial court, therefore, reasonably could have concluded that the stain on the jeans was wholly unrelated to the sexual assaults in question.

---

[15] We are puzzled at the assertion of the dissent, *Berdon, J.*, that there is no evidence in the record as to whether the jeans were in such proximity to the assailant that the stain could have been deposited during the incident. The victim's testimony was clear that the jeans had been "on the floor" and that the assaults had taken place on the bed.

In addition to the lack of evidence connecting the victim's attacker to the stain, the trial court had before it the fact that the jeans had been in police custody for ten years and that there was no indication that any steps had been taken to preserve the stained area for future testing. At the time that it ruled on the defendant's final request for a continuance, the trial court had no information before it indicating whether DNA testing was possible or whether such testing would shed any light on the defendant's guilt or innocence.[16]

The trial court also had knowledge that it would be some time, even if testing was possible, before any DNA testing could be completed. See *State* v. *Hamilton*, supra, 228 Conn. 240 (likely length of delay relevant consideration when deciding request for continuance). The defendant himself estimated that it would take twenty-one days for "preliminary" DNA testing and three months for "full blown" DNA testing. The court estimated that if it granted the defendant's motion for a continuance for DNA testing, the trial before the jury would not be resumed until October or November.

Taking into consideration the length of the requested continuance and its potentially negative effect on the

[16] The dissent by *Berdon, J.*, asserts that, at the time the court made its ruling on the defendant's final motion for a continuance, "the state and defense counsel both agreed that it was possible to perform [DNA] testing on the seminal stains." There is, however, no evidence in the record that either party agreed that there was a sufficient sample to conduct DNA testing. In its argument to the court on the final motion for a continuance, the state clearly stated that no steps had been taken with regard to DNA testing and that it would "take some time" to determine "if there is a sufficient sample, or sufficient material within the sampling to do a DNA test . . . ." Defense counsel did state that "we know that there is at least some testing that can be done on the blue jean[s]," but defense counsel was clearly talking about blood subgrouping tests, not DNA tests. Such an agreement, had one existed, would have directly controverted the testimony of Hawkins, the only witness who had any knowledge of the testing of the jeans. After explaining that DNA testing is only possible when there is a sufficient sample, Hawkins was asked by defense counsel "whether [the

jury, combined with the minimal chance that the testing, if performed, would provide information either connecting the defendant to the crime or exonerating him, the trial court informed the defendant that the case would proceed to a verdict and that sentencing would be delayed until any testing requested by the defendant had been completed. The court also indicated that, in the event that the test results were exculpatory, it would be inclined to grant the defendant's motion for a new trial on the basis of newly discovered evidence pursuant to Practice Book § 902.

The defendant essentially had the best of both worlds. He was able to argue to the jury that the state, which bore the burden of proof, had presented no scientific evidence connecting him to the crime, and he specifically highlighted the lack of testing on the jeans. The defendant made that argument with the knowledge that, even if he was convicted, he probably would be granted a new trial if the test results proved exculpatory.

On the basis of the unique circumstances of this case, we cannot agree with the Appellate Court that the trial court's denial of the defendant's motion for a continuance was an abuse of discretion.

II

We next consider the defendant's claim that the trial court erred in denying his motion for a new trial pursuant to Practice Book § 902[17] after DNA testing had

victim's jeans] could be tested or not." Hawkins replied: "I haven't seen the piece of evidence, so I can't render an opinion about that."

[17] Practice Book § 902 provides: "Upon motion of the defendant, the judicial authority may grant a new trial if it is required in the interests of justice. Unless the defendant's noncompliance with these rules or with other requirements of law bars his or her asserting the error, the judicial authority shall grant the motion:

"(1) For an error by reason of which the defendant is constitutionally entitled to a new trial; or

"(2) For any other error which the defendant can establish was materially injurious to him or her.

been completed.[18]

The following additional facts are relevant to this claim. On March 30, 1994, more than eight months after the jury had returned its verdict, the state and the defendant appeared in court to be heard concerning the defendant's motion for a new trial. The parties at that time presented a written stipulation to the court regarding the testing of the jeans. They stipulated that, during the pretrial stages of the defendant's case, they both had believed that the jeans in question had been lost by the Suffield police department and that the availability of the jeans did not come to their attention until the middle of the trial. They further stipulated that a cutting from the stained area of the jeans found to contain seminal fluid protein was sent to the Federal Bureau of Investigation (FBI) laboratory in Washington, D.C., for RFLP[19] DNA testing, but that the DNA was either insufficient or too degraded to yield results. A second cutting from the stained area of the jeans was subse-

"If the trial was by the court and without a jury, the judicial authority, with the defendant's consent and instead of granting a new trial, may vacate any judgment entered, receive additional evidence, and direct the entry of a new judgment."

We assume, without deciding, that a motion for a new trial pursuant to § 902, as opposed to a petition for a new trial pursuant to Practice Book § 904 and General Statutes § 52-270, was the appropriate procedural vehicle by which the defendant should have brought his claim relating to the test results.

[18] The dissent of *McDonald, J.*, takes the majority to task for resolving this claim, as well as the claim addressed in part III of this opinion. We point out, however, that both issues were fully briefed by the parties in the Appellate Court and we have carefully reviewed those briefs. Additionally, both issues require us to assess, in light of the results of the DNA testing, the effect on the defendant's trial of his inability to utilize the DNA results in his defense. In the context of the harmlessness component of his claim pertaining to the denial of his continuance, the defendant has fully briefed to this court the effect of the lack of DNA evidence on his trial. In light of these undisputed factors, it is difficult to perceive why we should make unnecessary additional work for the parties and the Appellate Court by remanding these issues to that court.

[19] RFLP stands for restriction fragment length polymorphism.

quently sent to the FBI laboratory with a request that both cuttings be subjected to PCR[20] DNA testing. The results of those tests revealed that the defendant could not be excluded as the depositor of the fluid on the first cutting from the stained area, but that he could be excluded as the depositor of the fluid on the second cutting. The parties stipulated that the victim, her husband, who at the time of the assaults had been her boyfriend, and the defendant were all "possible donors of the DNA detected in [the first] cutting."[21]

In explaining the meaning of the written stipulation to the court, defense counsel stated: "I think that what this stipulation that we've offered to Your Honor essen-

---

[20] PCR stands for polymerase chain reaction.

[21] The written stipulation provided as follows:

"1. During the pre-trial stages of this case both the state and defense were under the impression that the physical evidence (rape kit and articles of clothing) had been lost by the Suffield Police Department. Had the parties been aware that the clothing was available, the state would have had an obligation to make same available to [the] defense.

"2. During the middle part of the first week of evidence at the trial of this matter, the state and then the defendant became aware that there was in fact a pair of blue jeans with a seminal stain on them in the possession of the Suffield Police Department that had been worn by [the victim] at the time of her alleged attack.

"3. The state has had the State Forensic Science Laboratory test the jeans' crotch area and the finding is that seminal fluid protein was present. A cutting was then removed and sent to the FBI Lab in Washington for RFLP DNA testing. The DNA extracted was either insufficient or too degraded to yield results.

"4. A second cutting was sent with directions to do PCR DNA testing. Both the second cutting and the first cutting were probed for the DQ Alpha Type.

"5. The defendant is excluded as being a possible donor of the DNA detected in the seminal stain found in the second cutting.

"6. The defendant cannot be excluded as a donor of the DNA detected in the stain in the first cutting.

"7. The defendant is among six groups of people having alleles with a DNA DQ Alpha Type 2. The frequency of these subgroups in the Caucasian population totals approximately 20%.

"8. The alleles found in the first cutting are a mixture of 1.1, 1.2 and 2, indicating that the victim . . . her husband, and the defendant are possible donors of the DNA detected in the stain in this cutting."

tially boils down to mean—and if I thought that it meant more or less, I would suggest that we probably needed expert testimony—I am satisfied, after my discussions with Agent Dedman of the FBI, Elaine Pegliaro from the state lab, as well as talking to people from the Life Codes lab, that the work that the FBI did is certainly acceptable to the defense—and that *the bottom line is an inconclusive result.* This does not exonerate [the defendant]. It does not identify [the defendant] as being the depositor of that stain. I think that, essentially, that's what our stipulation means and should mean to you." (Emphasis added.)

The court then asked the defense if the testing results, in view of their inconclusive nature, would have been admissible. In response, defense counsel stated: "Well, I would suggest, first of all, that, in all probability, it would not—*this evidence would not have been proffered by the defense.* It would have been proffered by the state." (Emphasis added.) After further discussion with the court, during which the court plainly indicated that it would not have allowed the state to offer the inconclusive DNA results at trial, defense counsel attempted to clarify to the court whether the defense would have sought to introduce the inconclusive test results on behalf of the defendant. "I simply don't know. I simply don't know. I suspect—if everything had gone as had gone, I suspect not. But I—that's real hard. And it's just as if—it's real hard to know what questions I would have asked Dr. Hawkins, if any, concerning this evidence, with this information—you know, armed with this information. I mean, clearly, in this case, the defense was misidentification and the defense was that this was not [the defendant]—and this was not [the defendant's] stain. And so it's real hard for me to call these shots now, except with regard to how we saw the evidence come in. So I suspect that, yes, if that scenario took place, that it probably *would not be likely*

*that the defense would proffer it.* But I think that the state would. I really do." (Emphasis added.) Understandably confused, the trial court asked: "But in any event, you're hypothecating that [if] the state would have had this evidence that you anticipate it would have introduced to point the finger at your client?" After the defendant responded in the affirmative, the court followed up by asking: "And because the state didn't have this, you were somehow hurt?" The defendant then responded in the negative, and explained that the problem was that he had been forced, during trial, to ask Hawkins about the lack of testing on the jeans in order to highlight the fact that the state had not had them tested. In response, the state had inquired on cross-examination whether the testing procedures and results from Hawkins' laboratory would have been equally available to the defense and Hawkins testified that they would have been so available. The defendant claimed that he was harmed by his lack of knowledge regarding DNA because it had led him to make a tactical decision that had opened the door to the state's inquiry about the availability of testing to the defense. The defendant argued that, from the state's cross-examination, the jury might have inferred consciousness of guilt because the defendant did not have the jeans tested.[22]

The trial court was unpersuaded. "The Hobson's choice that the defense claims it was forced to make is, in the opinion of the court, nothing more difficult or troubling than the hundreds of instantaneous tactical decisions that trial counsel make in the course of a hotly-contested piece of litigation. And, indeed, with the benefit of that 20-20 hindsight that is the clearest

[22] The state, of course, was merely responding to the defendant's attempt to have the jury draw an inference that the state had something to hide because the state had not tested the jeans. The defendant never introduced evidence to the jury that the jeans had been misplaced by the Suffield police department, nor did he object to the state's limited cross-examination of Hawkins. See footnote 13 of this opinion.

vision in the world, the evidence could not have come out any better for the defense.

"Whether, after months of reflection, the defense might have wished to have pointed out to the jury that the availability to the defense was more limited than the availability to the prosecution . . . is no large thing. This is a case where the evidence, quite compellingly, identified the defendant. It also had powerful testimony that the defendant committed one of the three sexual assaults that he committed on the victim in this case that same day, with the use of a douche applicator to remove, the jury was entitled to infer, evidence of semen from the scene of the crime, if you will. So that, in that context, in this case, the fact that seminal stains that may or may not have been on these ten year old jeans were not tested, could not have been factored in the jury's mind at all. The defense did an absolutely world-class job between tooth repair[23] and the calling of Dr. Hawkins to point out that the DNA flags that the defense was waving around the courtroom had not been unfurled by the state. And the defense, again, with hindsight could not have had a better shot at raising reasonable doubt than if the testing had been done, and we mistried the case, and we started all over again, because we certainly couldn't have kept the jury from July until the following March waiting for this testing.

"The court has considerable doubt as to whether or not, in view of the inconclusive tests, that the testing results would have been admissible, if offered. And so the case, in playing out, would have had the same testimony as it did have without the questions about the fact that there were no tests on the seminal stains

---

[23] At trial, in response to the victim's statements to the police that her assailant had had good teeth, the defense had offered evidence that the defendant's front tooth had been chipped at the time of the crime.

in the jeans, which, in spite of the state's cross-examination question of Dr. Hawkins, that the defense might have been able to have those tests done as well as the prosecution. That testimony was helpful to the defense, on balance, far more helpful than injurious. So the motion for a new trial portion of the motion for order of testing and new trial, dated July 23, 1993, is denied, since the court finds that there was no error that the defense has established which was materially injurious to the defense."

Appellate review of the denial of a motion for a new trial pursuant to Practice Book § 902 is governed by an abuse of discretion standard. *State* v. *Thomas*, 210 Conn. 199, 213, 554 A.2d 1048 (1989); *State* v. *Rothenberg*, 195 Conn. 253, 264, 487 A.2d 545 (1985). We disagree with the defendant that the trial court abused its discretion by denying his motion for a new trial.

Section 902 (2), upon which the defendant relied in his motion to the trial court, requires a criminal defendant seeking a new trial to establish that a claimed trial error was "materially injurious" to him. Reduced to its essence, the defendant's claim on appeal is that the trial court's rulings that deprived him of the opportunity to offer DNA evidence at trial were materially injurious. The defendant cannot demonstrate from the record that his inability to present the DNA evidence to the jury was materially injurious.

In his briefs to the Appellate Court and to this court, the defendant has changed dramatically his position regarding the nature of the DNA test results. When arguing his motion for a new trial, the defendant represented to the trial court that, after consulting with three independent experts, he was satisfied that the DNA test results were inconclusive. In response to direct questions from the trial court, the defendant also repeatedly asserted that he probably would not even have

attempted to introduce the test results into evidence. When asked by the trial court to clarify his position, the defendant responded that his argument pertaining to the DNA testing was that he had been forced to prepare his cross-examination of Hawkins without the benefit of the knowledge of the test results. He argued that he was somehow prejudiced by Hawkins' testimony on cross-examination to the effect that any testing results and procedures were equally available to the defense as well as to the state. In his brief to this court, the defendant now claims that the DNA evidence was "exculpatory" and "certainly would have been useful to the defense at the time of trial . . . ." In his brief to the Appellate Court, the defendant argued that that court should reverse the trial court's decision on his motion for a new trial because the "exculpatory evidence which [the defendant] obtained, post-trial, was so compelling that the trial court improperly refused to rule that the verdict was contrary to the manifest weight of the evidence produced by the State."

It is difficult to fathom, in light of the record before the trial court, how the defendant can argue that the trial court abused its discretion by failing to grant a new trial. It would have been strange, indeed, for the trial court to have ordered a new trial when the defendant himself stated that the results were inconclusive and that, in any event, he probably would not have introduced those results into evidence. By espousing arguments that he failed to make at trial and that are completely at odds with the arguments that he did make at trial, the defendant cannot now demonstrate that the trial court abused its discretion. The defendant cannot meet his burden of proving material injury under § 902 on the basis of his inability to present to the jury test results that he himself characterized as inconclusive and that he probably would not have introduced into evidence.

Even if we were to allow the defendant to switch arguments on appeal and to assert that the evidence was exculpatory and that he would introduce that evidence on a retrial, he still cannot show an abuse of discretion. First, as discussed at some length in our treatment of the defendant's first claim, there is no evidence in the record connecting the victim's assailant to the stain on the jeans. The assailant forcibly removed the victim's jeans before any sexual contact was made and the victim did not put the jeans back on until after her attacker had gone to extreme lengths to remove any trace of semen. No semen was found on any of the vaginal swabs taken from the victim, nor was any semen found on the victim's bedspread or on the towel that the attacker had used to wipe the victim's vaginal area after he had first cleansed the vaginal area with a douche. The defendant's argument on a hypothetical retrial would have to be that despite the absence of semen anywhere else, some of the assailant's semen somehow had found its way solely to the victim's jeans that had been on the floor of the victim's bedroom while the sexual assaults were taking place on the victim's bed and in her bathroom. He also would have to concede to a new jury that one of the two cuttings from the single stain did contain DNA consistent with his own DNA. As the trial court aptly noted, such arguments would be weaker than those presented by the defendant at the first trial.[24] We consequently are unpersuaded that

[24] We disagree with the statement of the dissent, *Berdon, J.*, that we have made an "implicit finding of ineffective assistance of trial counsel." The dissent expresses dissatisfaction with trial counsel's representations to the trial court that the DNA results were inconclusive and that he would not have introduced those inconclusive results at trial if they had been known to him. Trial defense counsel made those representations to the court, however, only after speaking with representatives from the FBI, the state lab and the Life Codes lab. Although the contents of those three conversations are not part of the record, we presume that the experts told defense counsel that the results were inconclusive and that defense counsel merely communicated the consensus of the experts to the court. The dissent's dissatisfaction with trial counsel's representations is based entirely upon

the defendant's inability to present such evidence was materially injurious. This is particularly so in light of the overwhelming nature of the state's evidence, including, but not limited to, the victim's identification of the defendant that the defendant himself described in his Appellate Court brief as "vivid" and "detailed, direct and forceful." We cannot say, therefore, that the trial court abused its discretion when it denied the defendant's motion for a new trial.

## III

The defendant's final unresolved claim is that he was deprived of due process and his rights to a fair trial and to present a defense by the state's untimely disclosure of the existence of the jeans. It is undisputed that "[t]he principles of due process require the prosecution to disclose exculpatory evidence that is material to the defendant's guilt or punishment. *Brady* v. *Maryland*, [373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963)] . . . ." (Citations omitted.) *State* v. *Simms*, 201 Conn. 395, 405, 518 A.2d 35 (1986). "In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material. *Moore* v. *Illinois*, 408 U.S. 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972)." *State* v. *Simms*, supra, 405.

---

the fact that one of the two cuttings that was tested contained DNA that was not deposited by the defendant, but may well have been deposited by the victim and/or her husband. Although the issue of ineffective assistance of counsel is not before us, we simply note that trial defense counsel apparently was unwilling to purchase the marginal benefit to be derived from the evidence pertaining to the second cutting at the cost of placing before the jury evidence that the first cutting contained DNA consistent with the defendant's DNA. On its face, such strategy, after consultation with three independent experts, provides no basis for the dissent's perceived implicit finding of ineffective assistance of counsel, or of "damned foolishness."

Even if we were to accept the defendant's claim that the jeans were "suppressed" by the state in spite of our previous precedent stating that " '[e]vidence . . . that is disclosed, even if during trial, is not considered suppressed as that term is used in *Brady*' "; id., 407; and even if we were to accept the defendant's current claim that the evidence is favorable to him in spite of his representations at trial, the defendant cannot establish materiality.

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States* v. *Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985). For the same reasons we considered when reviewing the defendant's motion for a new trial, the defendant cannot demonstrate that, if he had had the jeans and the test results, there is a reasonable probability that the result of his trial would have been different.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgment of conviction rendered by the trial court.

In this opinion BORDEN and PALMER, Js., concurred.

MCDONALD, J., concurring and dissenting. I concur in part I of the majority opinion.

I respectfully dissent, however, as to part II.

This court granted the state's petition for certification to appeal from the Appellate Court's reversal of the defendant's conviction as follows: "Did the Appellate Court properly conclude that (1) the trial court abused its discretion in denying the defendant's motion for a

continuance for DNA[1] testing, and (2) the error was so prejudicial that it denied the defendant a fair trial?" *State* v. *Brown*, 238 Conn. 901, 677 A.2d 1376 (1996). This court has answered that question in the negative. Now, "[i]n the interests of judicial economy," this court also upholds the trial court's denial of the defendant's motion for a new trial after his conviction based on those DNA results and affirms the judgment of conviction.

This court did not choose to decide this appeal itself when it was originally filed, but chose, instead, to transfer it to the Appellate Court. See General Statutes § 51-199 (c); Practice Book § 4023. The Appellate Court acted only upon the issue of whether a midtrial continuance for DNA testing should have been granted. This court thereupon voted to review that sole issue and directed the parties to brief that issue. *State* v. *Brown*, supra, 238 Conn. 901. Oral argument was scheduled as to that sole issue before this court.

Parties, and members of this court, should be able to rely on the orders of this court as to the issue to be briefed and to be argued. Our task is to decide those issues briefed and argued before us. The majority, I regret to state, fails to uphold that paramount principle. I believe the majority should have left part II to be decided by the Appellate Court upon our reversal of its decision as to part I.

BERDON, J., dissenting. The majority today commits a grave injustice by misconstruing the trial record and by concluding that the defendant is not entitled to a new trial despite the discovery of exculpatory evidence that was not available during trial. I disagree with the majority's conclusion that the trial court properly denied the defendant's motions for a continuance and for a mistrial when the defendant sought to conduct

---

[1] See footnote 1 of the majority opinion.

deoxyribonucleic acid (DNA) testing on seminal stains found on the blue jeans worn by the victim at the time of the assault, when the whereabouts of the jeans were discovered for the first time during the trial. Furthermore, I disagree with the majority's conclusion that the trial court properly denied the defendant's motion for a new trial once the results of the DNA testing became available following the trial.[1]

I

In my view, when the defendant advised the trial court of the state's discovery of the jeans worn by the victim at the time of the assault, the trial court should have granted the defendant's motion for a continuance or, in the alternative, should have granted the motion for a mistrial, in order for the defendant to obtain the results of DNA testing on the seminal stains found on

---

[1] I agree with Justice McDonald, in his concurring and dissenting opinion, with respect to his assertion that this court should not reach the question of whether the trial court properly denied the defendant's motion for a new trial because the parties have not had the opportunity to brief this issue fully before this court. Indeed, this court certified this appeal, limited to the following question: "Did the Appellate Court properly conclude that (1) the trial court abused its discretion in denying the defendant's *motion for a continuance* for DNA testing, and (2) the error was so prejudicial that it denied the defendant a fair trial?" (Emphasis added.) *State* v. *Brown*, 238 Conn. 901, 677 A.2d 1376 (1996). In other words, the court today reaches the issue regarding the defendant's motion for a new trial despite the fact that the issue was neither addressed in the parties' briefs submitted to this court nor during oral argument. Simply put, "the majority of this court has deprived the defendant of his fundamental right of due process to be heard before this court 'in a meaningful manner.' *Armstrong* v. *Manzo*, 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)." *State* v. *Chapman*, 229 Conn. 529, 556, 643 A.2d 1213 (1994) (*Berdon, J.*, dissenting). Nevertheless, because the majority reaches and decides this issue on the merits, I am compelled to express my disagreement with the majority's conclusion.

The majority professes to reach this issue "[i]n the interests of judicial economy . . . ." Curiously, the majority's resolution of this issue turns the principle of judicial economy on its head in light of the fact that this case surely will return to the judicial system on a meritorious petition for a writ of habeas corpus as a result of this court's implicit finding of ineffective assistance of trial counsel. See footnote 11 of this dissent.

the crotch area of the jeans. I recognize that the granting of a continuance is generally a matter of discretion; *State* v. *Haye*, 214 Conn. 476, 483, 572 A.2d 974 (1990); but when the defendant's constitutional rights to present a defense and to a jury trial are implicated, that discretion either evaporates or is severely limited. The sole issue in the trial was one of identification and this objective identification DNA evidence was crucial. Although I can understand the trial court's concerns that this was a crime that occurred in 1983, that there previously had been a mistrial at the request of the state because of the unavailability of the victim,[2] and that the victim had already testified in this trial, these concerns pale in comparison to the deprivation of the defendant's constitutional rights and the subsequent loss of his liberty for fifty-one years—the sentences he received in this case.

The results of the DNA testing that was eventually performed by the Federal Bureau of Investigation (FBI) and that was available to the trial court when it decided the defendant's motion for a new trial are not disputed. The DNA testing was performed on two cuttings containing seminal stains taken from the jeans. The testing consisted of restriction fragment length polymorphism (RFLP) tests, which are highly specific, and polymerase chain reaction (PCR) tests, which are less specific, but still reliable. Although there were no results on the first cutting under the RFLP test because the seminal stain was insufficient or too degraded,[3] the PCR test did produce results. The PCR test on the first cutting revealed that the defendant could not be excluded as the depositor of the semen, nor could the victim's husband, who at the time of the assault had been her boyfriend, or 20 percent of the population. The PCR test on the second

---

[2] See footnote 8 of this dissent.

[3] The RFLP test also was not performed on the second cutting because it was assumed that the DNA would be insufficient or too degraded.

cutting, however, *did exclude* the defendant as a possible depositor of the semen. The following chart, set forth in the defendant's brief, summarizes these tests:

|  | RFLP DNA TEST<br>(specific test; to high probability, can identify a person) | PCR DNA TEST<br><br>(less specific test than RFLP; can reliably exclude a person) |
|---|---|---|
| CUTTING #1 | NO RESULTS<br>(DNA insufficient or too degraded) | PERSONS NOT EXCLUDED:<br>20% OF POPULATION, INCLUDING VICTIM, V'S HUSBAND & DEFENDANT |
| CUTTING #2 | NO RESULTS<br>(No RFLP test. Assumed DNA degraded or insufficient) | PERSONS NOT EXCLUDED:<br>VICTIM<br>**PERSONS EXCLUDED:**<br>DEFENDANT |

Although the testing results on the first cutting could not exclude the defendant as a possible depositor, the testing results on the second cutting clearly exonerated him as the depositor of that semen.

The majority concludes that the trial court properly denied the defendant's motion for a continuance essentially by performing its own fact-finding. Specifically, the majority states that "[t]he first relevant fact before the trial court was that the seminal fluid protein found on the jeans logically could not be connected to the sexual assault in issue." The trial court, however, never made this finding, and the majority fails to demonstrate where, in the record, the trial court took this into consideration. Indeed, the reason that the trial court did not make this finding is simple. If it were known that there were seminal stains on the jeans the victim was wearing and that one of the stains was exculpatory, *both* the state and defense counsel would have focused the examination of the victim on whether the exculpatory stain could have been deposited during the encounter. If that had occurred, there would have been a record in order to determine whether the jeans were in such

proximity to the assailant that the stain could have been deposited during the incident.[4]

Furthermore, the majority claims that, "[a]t the time that it ruled on the defendant's final request for a continuance, the trial court had no information before it indicating whether DNA testing was possible or whether such testing would shed any light on the defendant's guilt or innocence." Contrary to the majority's assertion, the state and defense counsel both agreed that it was possible to perform testing on the seminal stains.[5] Finally, the majority rationalizes its conclusion that the trial court properly denied the motion for a continuance in light of the amount of time necessary to complete the testing, stating that "[t]he defendant himself estimated that it would take twenty-one days for 'preliminary' DNA testing and three months for 'full-blown'

---

[4] It amazes me that the majority fails to understand how a male could have sexual intercourse on a bed and then drop semen on the victim's clothing next to the bed after ejaculation and withdrawal. See footnote 15 of the majority opinion.

[5] Specifically, the state's attorney pointed out that, besides the blood grouping tests that were performed, "[t]here are additional tests that can be done, but we're talking a minimum of two days, and that is the grouping which just boils down to—there are twenty-one subgroupings of blood types, some can be as high as 12 percent, some as low as 2 percent. That test would take a minimum of two days, probably three, and we have not done anything with respect to DNA yet. It is my understanding that the process has to be begun and, at some point in the process, they can make a determination, if there is a sufficient sample, or sufficient material within the sampling to do a DNA test, but that would also take some time."

Furthermore, defense counsel stated: "I think that we have gotten to a point where, number one, we know that there is at least some testing that can be done on the blue jean item that tested for a semen stain. We also know that within two to three days we could very likely have a more reliable testing done that might further break down the blood typing. So that what we know is that it's possible that within two to three days there could be a test which would exclude [the defendant] as a possibility here.

"It would seem to me that, as a matter of two to three days, rather than twenty-one days for preliminary DNA testing, or the three months for a full-blown DNA testing, that it would be worth, in the interest of justice, taking those two to three days to see what the results of that testing would be."

DNA testing." In fact, defense counsel argued for, at a minimum, a continuance for two to three days in order to perform subgrouping tests, claiming that "[i]t would seem to me that, as a matter of two to three days, rather than twenty-one days for preliminary DNA testing, or the three months for a full-blown DNA testing, that it would be worth, in the interest of justice, taking those two to three days to see what the results of that testing would be."[6]

This is not a case of a defendant who sought a continuance because of some failure on his part to muster the evidence or as a result of any other personal responsibility for the delay, but, rather, he sought the continuance because of the state's negligence. It was during the defendant's trial that the state disclosed, for the first time, that the jeans the victim was wearing when she was assaulted were discovered, and that those jeans showed a positive finding of semen. Therefore, in my view, the motions for a continuance and for a mistrial must be viewed through the lens of the state negligently failing to produce the jeans prior to trial, and thereby denying the defendant an opportunity to perform DNA testing.

Not only was the defendant deprived of his constitutional rights to a jury trial and to present a defense; see part II of this dissent; but he was also deprived of his statutory rights. General Statutes § 54-86k (a) provides in relevant part that DNA testing "shall be deemed to be . . . reliable scientific . . . evidence [and] may be admitted to prove or disprove the identity of any person."[7] Indeed, this court has held that the results of

---

[6] The record does not reflect that the subgrouping test was ever performed in light of the trial court's denial of the request for a continuance.

[7] General Statutes § 54-86k provides in relevant part: "Admissibility of results of DNA analysis. (a) In any criminal proceeding, DNA (deoxyribonucleic acid) testing shall be deemed to be a reliable scientific technique and the evidence of a DNA profile comparison may be admitted to prove or disprove the identity of any person. This section shall not otherwise limit

DNA testing can be compelling evidence in a case. See *State* v. *Hammond*, 221 Conn. 264, 279, 604 A.2d 793 (1992) ("[b]lood typing tests, at least insofar as they exclude someone from sexual contact, are generally acknowledged to be absolutely reliable when the sample is not contaminated"). Irrespective of which standard of review is to be applied, the trial court improperly denied the motion for a continuance or the alternative motion for a mistrial.[8]

Moreover, the trial court improperly refused to grant a new trial once the results of the DNA testing became available subsequent to the jury verdict finding the defendant guilty. The majority, in its recitation of the hearing on the motion for a new trial, takes trial defense counsel's comments out of context and disregards the plain language of the parties' stipulation regarding the results of DNA testing performed on the two cuttings taken from the victim's jeans. The majority disingenuously states that "[t]he results of those tests revealed that the defendant could not be excluded as the depositor of the fluid on the first cutting from the stained area, but that he *could be excluded* as the depositor of

the introduction of any relevant evidence bearing upon any question at issue before the court. The court shall, regardless of the results of the DNA analysis, if any, consider such other relevant evidence of the identity of the accused as shall be admissible in evidence.

"(b) If the results of the DNA analysis tend to exculpate the accused, the prosecuting authority shall disclose such exculpatory information or material to the accused in accordance with section 54-86c. . . ."

[8] It is paradoxical that the state previously had been granted a mistrial because it did not have its evidence available—that is, the victim was not available to testify, whereas, in this trial, the trial court denied the defendant's motion for a mistrial when the defendant was unable to produce all of his evidence because of the state's negligence in not producing the victim's jeans. Furthermore, I note that, although the issue is not before us, in the absence of the defendant's consent to a new trial, the first mistrial would raise serious questions with respect to the constitutional prohibition against double jeopardy. See *State* v. *Buell*, 221 Conn. 407, 413–14, 605 A.2d 539, cert. denied, 506 U.S. 904, 113 S. Ct. 297, 121 L. Ed. 2d 221 (1992) ("[j]eopardy attaches once the jury has been selected and sworn").

the fluid on the second cutting." (Emphasis added.) In fact, the stipulation entered into by the defendant and the state provide in relevant part that "[t]he defendant *is excluded* as being a possible donor of the DNA detected in the seminal stain found in the second cutting."[9] (Emphasis added.) Indeed, the plain language of the stipulation reflects that the results of the DNA testing were clearly exculpatory.

The majority, however, asserts that defense counsel conceded that the testing results were not exculpatory. This simply is not the case. In explaining the significance of the stipulation, defense counsel stated: "I think that what this stipulation that we've offered to Your Honor essentially boils down to mean—and if I thought that it meant more or less, I would suggest that we probably needed expert testimony—I am satisfied, after my discussions with [both an FBI agent], Elaine Pegliaro from the state lab, as well as talking to people from the Life Codes lab, that the work that the FBI did is certainly acceptable to the defense—and that the bottom line is an inconclusive result. This does not exonerate [the defendant]. *It does not identify [the defendant] as being the depositor of that stain.* I think that, essentially, that's what our stipulation means and should mean to you."[10] (Emphasis added.) Taking into consideration defense counsel's argument to the trial court

[9] The parties' stipulation provides in relevant part:

"5. The defendant is excluded as being a possible donor of the DNA detected in the seminal stain found in the second cutting.

"6. The defendant cannot be excluded as a donor of the DNA detected in the stain in the first cutting.

"7. The defendant is among six groups of people having alleles with a DNA DQ Alpha Type 2. The frequency of these subgroups in the Caucasian population totals approximately 20 percent."

[10] General Statutes § 54-86k (a) establishes not only the admissibility of DNA testing results, but also provides that "[t]he court shall, regardless of the results of the DNA analysis, if any, consider such other relevant evidence of the identity of the accused as shall be admissible in evidence." See footnote 7 of this dissent.

together with the clear language of the stipulation, it becomes clear that defense counsel must have meant that the DNA testing on the first cutting did not exonerate the defendant because it did not exclude him, the victim, the victim's husband or 20 percent of the population. But, clearly, the testing on the second cutting excluded the defendant and, for this reason, it was exculpatory.

The majority attempts to make much of the fact that defense counsel characterized the DNA testing results as "inconclusive." According to the majority, because defense counsel stated that the results were inconclusive, the results are therefore inadmissible and of no value. The majority, however, simply misses the point. Defense counsel obviously recognized that the results were inconclusive as to the defendant's guilt or innocence because the seminal stain on the second cutting could have been deposited by a third party. This, however, does not mean that the testing results could not raise a reasonable doubt with a jury with respect to whether the defendant was the perpetrator of the crime.[11]

The majority further justifies the denial of the motion for a new trial because of defense counsel's alleged concession before the trial court that he would not have attempted to introduce the results of the DNA testing

[11] Contrary to the majority's assertion; see footnote 24 of the majority opinion; I express no dissatisfaction with defense counsel's representation to the trial court that the testing was inconclusive—in fact, defense counsel's statement is entirely accurate with respect to the defendant's guilt or innocence based on the results of the DNA testing. I mention ineffective assistance of counsel in footnote 1 of this dissent, not on the basis of what defense counsel did or did not do at trial, but, rather, on the majority's mischaracterization of the defense. Simply put, if defense counsel had conducted the defense in the manner characterized by the majority, that is, by conceding that the results of the DNA testing were not exculpatory and that he would not have proffered those results, that would serve as the basis for a claim of ineffective assistance of counsel.

into evidence anyway. Contrary to the majority's recitation of the proceedings, defense counsel actually stated that he would not have proffered the evidence because he would have expected that the prosecution would have done so as part of its case-in-chief: "Well, I would suggest, first of all, that, in all probability, it would not—this evidence would not have been proffered by the defense. *It would have been proffered by the state.*" (Emphasis added.) Furthermore, when the trial court attempted to have defense counsel explain what might have happened had the results been available, the following colloquy occurred:

"The Court: But, in any event, you agree with me the defense would not have proffered this evidence, had it been available to the defense in July of 1993.

"[Defense Counsel]: I can't say that.

"The Court: Oh, I'm sorry.

"[Defense Counsel]: I simply don't know. I simply don't know. I suspect—if everything had gone as had gone, I suspect not. But I—that's real hard to know. And it's just as if—it's real hard to know what questions I would have asked [Sanders Hawkins, the state's chief toxicologist], if any, concerning this evidence, with this information—you know, armed with this information. I mean, clearly, in this case, the defense was misidentification and the defense was that this was not [the defendant]—and this was not [the defendant's] stain. And so it's real hard for me to call those shots now, except with regard to how we saw the evidence come in.

"So I suspect that, yes, if that scenario took place, that it probably would not be likely that the defense would proffer it. But I think that the state would. I really do."[12]

---

[12] Indeed, the confusion concerning defense counsel's remarks strongly supports Justice McDonald's concurring and dissenting opinion in which he states that this court should not decide the issue regarding the motion

Nevertheless, even if defense counsel's statements could be construed as a concession that he would not have proffered the evidence, a new trial is still required. In my view, any agreement by defense counsel that he would not have attempted to proffer the testing results would be one of those "truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings"; (internal quotation marks omitted) *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 25, 664 A.2d 719 (1995); and, therefore, constitutes plain error.[13] Indeed, if defense counsel had represented to the trial court that he would not have sought to introduce the exculpatory DNA evidence, it would have gone beyond plain error— it would have been, based upon the record before us, damned foolishness.

## II

The trial court's failure to grant a continuance, a mistrial or a new trial deprived the defendant of his right to present a defense and to a jury trial under the sixth amendment to the federal constitution. "The United States Supreme Court has made it clear that the right of an accused to present testimony that is relevant and material may not be denied arbitrarily. *Washington*

for a new trial without the benefit of complete briefing. See footnote 1 of this dissent. This injustice to the defendant is underscored by the fact that the majority interprets defense counsel's comments to the trial court by "presuming" what defense counsel's conversations with the experts entailed. See footnote 24 of the majority opinion.

[13] The majority states that, even if the defendant were allowed to "switch" his argument regarding the testing results on appeal, the defendant is nevertheless unable to demonstrate an abuse of discretion. The majority reaches this conclusion by determining, in hindsight and with allegedly unassailable acumen, that the seminal stains found on the victim's jeans could not possibly have been deposited by the defendant. In my view, the majority is simply acting as a thirteenth juror—a role that is not within the province of this court.

v. *Texas*, 388 U.S. 14, 23, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967)." *State* v. *Porter*, 241 Conn. 57, 161, 698 A.2d 739 (1997) (*Berdon, J.*, concurring and dissenting).

In *Sullivan* v. *Louisiana*, 508 U.S. 275, 277, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993), the United States Supreme Court stated, in a unanimous decision, that the sixth amendment right to a jury trial is " 'fundamental to the American scheme of justice,' " and, therefore, is applicable to the states. The court further held: "The right includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of 'guilty.' " Id.; see also *State* v. *Hines*, 187 Conn. 199, 210, 445 A.2d 314 (1982) (" '[i]t must always be borne in mind that litigants have a constitutional right to have issues of fact decided by the jury and not by the court' "). The court in *Sullivan* emphasized that "[i]t would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty, and then leave it up to the judge to determine . . . whether he is guilty beyond a reasonable doubt." *Sullivan* v. *Louisiana*, supra, 278. In the present case, however, that is essentially what happened: the jury heard some of the evidence and decided guilt, and then the judge heard the additional evidence relating to the DNA testing results. This precluded the jury from hearing this clearly exculpatory evidence. This, in my view, does not satisfy the defendant's sixth amendment right to a jury trial.

Moreover, as the court in *Sullivan* held, harmless error analysis would be inapplicable. "Harmless-error review looks, we have said, to the basis on which 'the jury actually rested its verdict.' . . . The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty

verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee." (Citations omitted.) Id., 279. In the absence of a proper jury verdict—which in this case means a verdict rendered by a jury that also heard the evidence relating to the DNA testing results—"[t]here is no object, so to speak, upon which harmless error scrutiny can operate." Id., 280. "There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the same verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless." Id.[14]

The trial court in this case denied the defendant the opportunity to present to the jury the exculpatory evidence of the DNA testing results. Because the trial court's denial is presumptively prejudicial to the defendant, and because harmless error review is not applicable, a new trial is required.[15] I would affirm the judgment

[14] In *Sullivan*, the court further recognized another mode of analysis that would lead to the same conclusion that harmless error analysis would not apply. The court noted that, in *Arizona* v. *Fulminante*, 499 U.S. 279, 307, 309, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991), a distinction was drawn between "structural defects in the constitution of the trial mechanism, which defy analysis by harmless-error standards," and trial errors that occur "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented . . . ." (Internal quotation marks omitted.) *Sullivan* v. *Louisiana*, supra, 508 U.S. 281. The court concluded: "Denial of the right to a jury verdict of guilt beyond a reasonable doubt is certainly an error of the former sort, the jury guarantee being a basic protectio[n] whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function . . . . The right to trial by jury reflects, we have said, a profound judgment about the way in which law should be enforced and justice administered. . . . The deprivation of that right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error." (Citations omitted; internal quotation marks omitted.) Id., 281–82.

[15] Even if the defendant were required to show prejudice, the wrongful exclusion of the evidence of the DNA testing results is clearly prejudicial. Although it is not conclusive because the seminal stain could have been deposited by another male, it is clearly powerful exculpatory evidence in a case in which, as here, the sole issue is one of identification.

of the Appellate Court and remand the matter for a new trial.

Accordingly, I dissent.